STATE OF NORTH CAROLINA v. LeMORRIS J. CHAPMAN,
A/K/A LAMORRIS J. CHAPMAN

No. 146A02

(Filed 7 April 2005)

### 1. Jury— capital selection—peremptory challenges—*Batson* claim

The trial court did not err in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by allowing the State's exercise of its peremptory challenges against two African-American prospective jurors even though defendant alleged racial discrimination, because: (1) the shared race of the involved parties tended to contradict an inference of purposeful discrimination by prosecutors; (2) one of the prospective jurors expressed serious reservations about recommending the death penalty and two of the other prospective juror's children were prosecuted for serious offenses by the same district attorney office; and (3) responses elicited from one prospective juror were in a manner that was similar to the questioning of all other prospective jurors and from the other prospective juror in a manner tailored to address her unique circumstances.

### 2. Jury— capital selection—voir dire—views on death penalty—hypothetical questions—sympathy for defendant—passing judgment on defendant

The trial court did not abuse its discretion in a capital trial by concluding that the prosecutor did not ask improper questions during voir dire regarding how jurors would vote during the sentencing phase, whether jurors' decisions would be based upon the law or their personal feelings, whether jurors had sympathy for defendant, and whether jurors understood they were not being asked to pass judgment on defendant, because: (1) the prosecutor's general questions represented a legitimate attempt to elicit prospective jurors' personal views on capital punishment, did not tend to commit prospective jurors to a specific future course of action, and helped to clarify whether the prospective jurors' personal beliefs would substantially impair their ability to follow the law; (2) although the form of some of the prosecutor's questions were hypothetical, these questions also did not commit jurors to a specific future course of action in

defendant's case, the questions were not aimed at indoctrinating jurors with views favorable to the State, and the questions were simple and clear without a propensity for confusing jurors; (3) the prosecutor's questions did not address definable qualities of defendant's appearance or demeanor, and in fact the pertinent question concerned jurors' feelings toward defendant notwithstanding his courtroom appearance or behavior; and (4) in regard to the prosecutor's statement that the jurors were not being asked to pass judgment upon defendant, our Supreme Court has declined to extend application of the plain error doctrine to situations where a party has failed to object to statements made by the other party during jury voir dire.

### 3. Evidence— photographs—testimony—physical evidence

The trial court did not abuse its discretion in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by admitting into evidence an autopsy photograph of the victim, two photographs of the car in which the victim was shot, and the victim's clothing, nor did the trial court commit plain error by admitting blood-stained seat material seized from the car and testimony of three law enforcement officers describing the car's interior and the victim's wounds, because: (1) the trial court admitted each photograph for illustrative purposes only, and two witnesses used the photographs to explain relevant portions of their testimony; (2) the autopsy photograph tended to explain and support a witness's expert opinion as to the cause of the victim's death, and the photographs of the car's interior corroborated an officer's testimony describing the crime scene and showed the location at which the victim sustained the gunshot wound; (3) an officer's testimony carried significant probative value tending to show the location and circumstances of the victim's death, and the probative value was not outweighed by danger of unfair prejudice; (4) the testimony of a former evidence and crime scene technician concerning the fabric swatch was introduced by prosecutors solely to inform the jury that stains on the car's rear seat had been tested for blood and that the stains were in fact blood, the evidence was probative of the location and circumstances of the victim's death, and the probative value was not outweighed by danger of unfair prejudice; (5) the victim's clothing was not published to the jury and was minimally discussed during the direct examination of a former evidence and crime

scene technician whose testimony served to authenticate the items, and the technician's testimony that he picked up the victim's clothing from the gurney that the victim was lying on was relevant and admissible for authentication purposes; and (6) a detective's testimony describing the victim's body in the hospital emergency room was probative of the cause and nature of the victim's death, and its probative value was not outweighed by danger of unfair prejudice.

**4. Evidence— hearsay—not offered for truth of matter asserted—course of conduct**

The trial court did not err in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by admitting alleged hearsay evidence during the direct examination of a detective who testified from his notes concerning his interview with defendant, because: (1) defendant did not preserve an assignment of constitutional error for review; (2) defendant's statement to the detective was admissible as the statement of a party opponent; (3) the words of an unidentified caller contained within defendant's statement to the detective were not hearsay since they were not offered to prove the truth of the matter asserted, but instead the phone call was admitted to show defendant's response to receiving the call; and (4) the testimony was relevant to explain defendant's course of conduct following the shooting and the statement was not unfairly prejudicial.

**5. Evidence— prior consistent statements—corroboration**

The trial court did not err in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by admitting a detective's testimony that he overheard defendant's coparticipant tell his mother that he was tired of lying and he was going to tell the police the truth during a phone call that the coparticipant made from the police interview room, because: (1) the testimony was admissible to corroborate the coparticipant's earlier testimony as a State's witness; and (2) the testimony was admissible as a prior consistent statement which tended to strengthen the coparticipant's credibility regarding his testimony that although he initially lied to law enforcement, he decided to tell the truth after speaking to his mother.

**6. Evidence— hearsay—caught in lie—not offered for truth of matter asserted**

The trial court did not err in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by admitting three statements made by a detective on direct examination about his interview with defendant's coparticipant concerning officers checking out the coparticipant's story about staying with two ladies and finding the statement to be true, that there were statements made at the ladies' apartment that the coparticipant was aware of the pertinent shooting, and that officers had information that the coparticipant stayed the night with the two ladies, because: (1) the central purpose for offering the detective's statements was to show the coparticipant's response to being caught in a lie during his second police interview; (2) the statements challenged by defendant were not offered to prove the truth of the matter asserted; and (3) defendant's constitutional assignment of error on this matter has been waived.

**7. Evidence— testimony—witness testified truthfully—testimony of witness's attorney**

The trial court did not err or commit plain error in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by admitting the statements of defendant's coparticipant that he testified truthfully during direct and redirect examinations after his credibility was attacked, by admitting the coparticipant's testimony that he was represented and advised by counsel during the formalization of a plea agreement related to the victim's death, and by admitting the testimony of the coparticipant's attorney that the coparticipant was represented by counsel during plea negotiations on charges related to the victim's death, because: (1) it cannot be said that the coparticipant's responses probably altered the outcome of the trial; (2) the coparticipant's redirect testimony was properly allowed to explain impeaching evidence elicited by defense counsel on cross-examination; and (3) the coparticipant's attorney was properly called to corroborate the coparticipant's testimony after he was impeached on cross and recross-examinations, and the attorney's testimony substantially corroborated the coparticipant's testimony by explaining why he pled guilty to second-degree murder.

**8. Appeal and Error— preservation of issues—failure to raise constitutional issues at trial**

Although defendant contends the trial court violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by admitting a detective's testimony that defendant surrendered to law enforcement officers in the presence of his family and his attorney, and that after taking defendant into custody the detective did not conduct an interview with defendant, this assignment of error is overruled because constitutional error will not be considered for the first time on appeal.

**9. Criminal Law— prosecutor's arguments—right to remain silent—personal belief on truthful witnesses—misstatement of law—hypothetical factual scenario**

The trial court did not err by failing to intervene ex mero motu in a capital first-degree murder, attempted first-degree murder, and discharging a firearm into occupied property case by admitting during opening and closing arguments the prosecutors' statements that defendant contends commented on defendant's right to remain silent, asserted that the State's witnesses were truthful, and misstated the law regarding felony murder, nor did it err by allowing the prosecutor to argue an alleged irrelevant hypothetical factual scenario to the jury, because: (1) the prosecutor's closing argument explained the circumstantial nature of evidence tending to show premeditation and deliberation without encouraging jurors to infer guilt from defendant's silence, any reference to defendant's failure to testify was indirect, and there was no reference to defendant's decision to exercise his right to silence during the prosecutor's opening statements; (2) under the circumstances where defense counsel impeached each witness with a prior inconsistent statement and also elicited information from each witness which supported an inference of bias, prosecutors were entitled to argue why and how the witnesses came to tell law enforcement various versions of events and that the sequence of events advanced by the State should be credited by the jury; (3) although the prosecutor's argument applying the law of felony murder to the facts of defendant's case was oversimplified, the prosecutor's statements were not inaccurate or confusing to a degree requiring ex mero motu intervention by the trial court; and (4) the prosecutor's hypothetical example accurately illustrated the law of felony murder.

**10. Homicide— attempted first-degree murder—first-degree murder—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the attempted first-degree murder and first-degree murder charges at the close of all the evidence, because the State presented substantial evidence to support a conclusion that defendant acted with premeditation, deliberation, and specific intent to kill including evidence of: (1) defendant's motive, preparation, and conduct and statements during the events surrounding the shooting; (2) the multiple gunshots fired by defendant; (3) the total lack of provocation for defendant's actions; and (4) defendant's attempt to conceal his involvement in the shooting.

**11. Homicide— first-degree murder—failure to instruct on lesser-included offense of second-degree murder**

The trial court did not err in a capital first-degree murder case by refusing to instruct the jury on second-degree murder, because: (1) the State presented sufficient evidence to prove premeditation, deliberation, and specific intent to kill; (2) defendant's statement that he was going to shoot the car and the fact that these shots were fired at night and between two moving vehicles in no way negated the State's evidence of mens rea; (3) there was no indication from the State's evidence that defendant was intoxicated to a degree sufficient to negate mens rea; and (4) defendant did not present evidence during the guilt-innocence phase of borderline mental retardation or any mental or emotional disturbance, and common sense compels that evidence which is not presented until the capital sentencing proceeding cannot serve as the basis of a trial court's ruling during the guilt-innocence phase.

**12. Homicide— first-degree murder—instruction—specific intent to kill**

The trial court did not err in a capital first-degree murder and attempted first-degree murder case by refusing to supplement its specific intent to kill instruction with defendant's special requested instruction that "it is not enough that defendant merely committed an intentional act that resulted in the victim's death" because this requested instruction was unsupported by the evidence when there was no evidence presented at trial to negate the State's evidence of mens rea.

STATE v. CHAPMAN

[359 N.C. 328 (2005)]

**13. Homicide— first-degree murder—instructions—three the-ories—submission of not guilty verdict**

The trial court did not fail to submit a not guilty verdict in its instructions on first-degree murder where the court submitted three separate theories of first-degree murder to the jury: (1) malice, premeditation and deliberation, (2) felony murder based upon attempted first-degree murder, and (3) felony murder based upon discharging a firearm into occupied property; the trial court omitted language after its instruction for felony murder based upon attempted first-degree murder that if the jury did not find certain matters, then jurors should not return a verdict of guilty under that theory; and at the conclusion of the trial court's mandate on all three theories of first-degree murder, the court instructed the jurors that if they did not find defendant guilty of first-degree murder on the basis of malice, premeditation and deliberation and if they did not find defendant guilty of first-degree murder under the felony murder rule, it would be their duty to return a verdict of not guilty.

**14. Homicide— felony murder—discharging firearm into occupied vehicle—motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree felony murder based upon the felony of discharging a firearm into an occupied vehicle, because the State presented sufficient evidence of defendant's intent to kill an occupant of the vehicle.

**15. Sentencing— death penalty vacated—defendant under eighteen years old**

Defendant's death sentence in a first-degree murder case is vacated pursuant to the United States Supreme Court's recent decision in *Roper v. Simmons*, —— U.S. ——, —— L. Ed. 2d —— (2005), because defendant was not yet eighteen years old at the time he murdered the victim.

Justice NEWBY did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Jerry Cash Martin on 2 November 2001 in Superior Court, Johnston County, upon a jury verdict finding defendant guilty of first-degree murder. On 21 February 2003, this Court allowed defendant's motion to bypass

**STATE v. CHAPMAN**

[359 N.C. 328 (2005)]

the Court of Appeals as to his appeal of additional judgments. On 1 April 2004, this Court allowed defendant's motion to hold decision pending the United States Supreme Court's decision in *Roper v. Simmons*, 112 S.W.3d 397 (Mo. 2003), *cert. granted*, 540 U.S. 1160, 157 L. Ed. 2d 1204 (2004). Heard in the Supreme Court of North Carolina 17 November 2003.

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Staples Hughes, Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender and Kelly D. Miller, Assistant Appellate Defender, for defendant-appellant.*

BRADY, Justice.

Seleana Ceana Nesbitt was fatally shot in the head on 9 July 2000, while riding with her friend, Brandy Raquel Smith, in the back seat of a car on the way home from a nightclub. On 24 July 2000, a Johnston County grand jury indicted defendant LeMorris J. Chapman for the first-degree murder of Ms. Nesbitt and attempted first-degree murder of Ms. Smith. On 9 July 2001, a second Johnston County grand jury returned an additional indictment against defendant for discharging a firearm into occupied property.

Defendant was tried capitally before a jury at the 8 October 2001 Criminal Session of the Johnston County Superior Court. On 29 October 2001, a jury returned a verdict of guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury also found defendant guilty of attempted first-degree murder and discharging a firearm into occupied property. On 2 November 2001, following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment accordingly. The trial court also sentenced defendant to consecutive prison terms of 157 months to 198 months for attempted first-degree murder and 25 to 39 months for discharging a firearm into occupied property.

Defendant appealed his death sentence to this Court, and on 21 February 2003, the Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of the noncapital convictions and judgments. This Court heard oral argument in defendant's case on 17 November 2003. On 1 April 2004, the Court allowed defendant's motion to hold decision pending the United States Supreme Court's

decision in *Roper v. Simmons*, 112 S.W.3d 397 (Mo. 2003), *cert. granted*, 540 U.S. 1160, 157 L. Ed. 2d 1204 (2004). The United States Supreme Court issued its opinion in *Roper* on 1 March 2005. —— U.S. ——, —— L. Ed. 2d ——, 2005 U.S. LEXIS 2200 (Mar. 1, 2005) (No. 03-633). After consideration of the assignments of error raised by defendant on appeal and a thorough review of the transcript, record on appeal, briefs, oral arguments, and *Roper v. Simmons*, we find no error in the guilt-innocence phase of defendant's trial but vacate defendant's death sentence as "cruel and unusual" consistent with *Roper*.

## FACTUAL BACKGROUND

Evidence presented by the State at trial tended to show that on 7 July 2000, defendant's ex-girlfriend Alecia Doughty drove past an apartment where defendant was attending a cookout. Doughty was driving a Nissan Sentra that belonged to Greg Brooks, and Brooks was riding in the passenger seat. Later that night defendant spoke to Doughty by phone and asked about Brooks. Defendant then told Doughty to come pick him up. Doughty did so, and defendant and Doughty spent the night together. On the following day, Doughty dropped defendant off at another house, where defendant called Doughty on the phone and told her, "I ain't f——g with you no more."

On 8 July 2000, defendant and five of his friends decided to go to Club 39, a nightclub near Mudcat Stadium in Wake County. The group included Lee Green, DaJuan Morgan, Jared Clemmons, Donald Lamont Dennis, and Shamarh McNeil. Because they could not all fit into defendant's Honda, the group decided to borrow a vehicle from another friend, Garry Yarborough. Clemmons, McNeil, and Dennis drove defendant's Honda to Yarborough's home in Wilson Mills to exchange it with Yarborough's white Cadillac Seville. There the group talked with Yarborough's wife Mya, as well as defendant's brother, Chris Chapman, and Chris' fiancée, Shenita. Before the group left, Yarborough gave Clemmons a loaded Soviet era SKS Carbine, semi-automatic rifle "for protection in case something happens at the club tonight." Clemmons handed the rifle to McNeil, who placed it in the trunk of Yarborough's Cadillac.

That evening Clemmons drove defendant, Green, Dennis, Morgan and McNeil to Club 39 in the Cadillac. As they approached the club, the group saw security guards stopping vehicles in the club's driveway and checking for weapons. Clemmons turned the car around and

defendant told Clemmons to drive into the nearby Mudcat Stadium parking lot. Clemmons testified that upon their arrival at the stadium, defendant called his brother Chris. The group waited, and after approximately fifteen minutes, Chris Chapman arrived at the stadium parking lot. Defendant got out of the Cadillac and spoke with Chris. When defendant returned to the Cadillac, he handed Dennis a brown McDonald's bag containing a black .45 caliber ACP, semi-automatic handgun. McNeil testified that he was not surprised to see Chris Chapman in the stadium parking lot because the meeting had been pre-arranged.

On the way back to the club, defendant instructed Clemmons to stop the car. Then defendant and Dennis stepped out of the vehicle, opened the trunk, and removed the SKS rifle. Defendant and Dennis concealed the rifle and handgun in a ditch beside a light pole in a wooded area. Thereafter, the group proceeded to Club 39, arriving sometime after 10:00 p.m.

Defendant saw Doughty at the club and tried unsuccessfully to speak with her. Brooks, who was also at the club, had not previously met defendant, but spoke with him and shook his hand. Defendant and his friends stayed at the club until after it closed at 3:00 a.m. Brooks, his cousin Lavires Richardson, Seleana Nesbitt, and Brandy Smith left at the same time in Brooks' blue Nissan Sentra. Green testified at trial that he did not speak to Ms. Nesbitt at the club because he knew she was with Brooks. Green also testified that he knew Brooks drove a Nissan Sentra and that he had seen Seleana standing next to that car in the parking lot before leaving the club.

On the way home from the club, defendant and his friends stopped to retrieve the hidden SKS rifle and handgun, placing both weapons in the passenger area. Clemmons drove; defendant rode in the front passenger seat, and Green, Morgan, Dennis, and McNeil sat in the back. After they reached Highway 39, defendant instructed Clemmons to speed up and to pass certain vehicles. As they approached Brooks' car from behind, one of the passengers said, "[T]hat's them right there." Defendant replied, "[L]et's get that m——rf——r." Then defendant told Clemmons not to pass Brooks' car. While the Cadillac was behind Brooks' vehicle, defendant called his brother and instructed him not to pass the car in front of them because defendant was "about to shoot up this car." Defendant began firing the SKS rifle out of the front passenger side window while DaJuan Morgan fired the handgun out of the rear left window. Defendant shot the rifle six to eight times, and Morgan fired the hand-

gun three to four times. Then defendant boasted to his friends that "we wet the car up, the m——rf——r."

After the shooting, defendant told Clemmons to park the Cadillac at Percy Flowers' store, where defendant had seen Garry Yarborough sitting outside. Defendant and his friends, who appeared excited, told Yarborough what had just happened. Defendant and Dennis hid the rifle and handgun in Yarborough's yard and after riding together briefly, the group went their separate ways.

Seleana Nesbitt and Brandy Smith, who were back seat passengers in Brooks' car, were both shot. Brooks immediately drove to Johnston Memorial Hospital in Smithfield, where Ms. Smith was treated for her wounds and Ms. Nesbitt was pronounced dead.

Additional relevant facts will be presented when necessary to resolve specific assignments of error raised by defendant.

## JURY SELECTION

[1] In his first argument, defendant assigns error to the State's exercise of peremptory challenges against prospective jurors, Linda Thorne Barbour and Amanda Flonard, in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). Defendant objected to both peremptory challenges during *voir dire*. In ruling on each *Batson* objection, the trial court concluded that "there has not been a prima facie showing by the defendant that the State is exercising a peremptory challenge to exclude jurors on account of race." Defendant contends that the *prima facie* requirement was met and requests a new trial or, alternatively, an evidentiary hearing. We affirm the trial court's ruling as to both prospective jurors.

In *Batson v. Kentucky*, the United States Supreme Court reaffirmed the principle first announced in *Strauder v. West Virginia*, 100 U.S. 303, 25 L. Ed. 664 (1880), that purposeful exclusion of African-Americans from participation as jurors solely on account of race violates a defendant's rights under the Equal Protection Clause of the United States Constitution. *Batson*, 476 U.S. at 85-86, 90 L. Ed. 2d at 80. The Court defined a three-part test for determining whether a juror has been impermissibly excused on the basis of race. *Id.* at 96-98, 90 L. Ed. 2d at 87-89. To establish a viable *Batson* challenge, a defendant must first show that he is a member of a "cognizable racial group" and that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the jury panel. *Id.* at 96, 90 L. Ed. 2d at 87. If such a showing is made, "the bur-

den shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." *Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405 (1991). To prevail, "the defendant must show that these facts and *any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the [prospective jurors] . . . on account of their race." *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88 (emphasis added). In making this showing, a defendant is "entitled to rely on the fact" that peremptory challenges "permit[] 'those to discriminate who are of a mind to discriminate.' " *Id.* at 96, 90 L. Ed. 2d at 87 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 97 L. Ed. 1244, 1247-48 (1953)). Moreover, "relevant circumstances" may include, but are not limited to, the race of the defendant and the victim(s), the race of key witnesses, a " 'pattern' of strikes" against African-American jurors, and a "prosecutor's questions and statements during *voir dire* examination and in exercising his challenges." *Id.* at 97, 90 L. Ed. 2d at 88; *see also State v. Barden*, 356 N.C. 316, 343-44, 572 S.E.2d 108, 126-27 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003); *State v. King*, 353 N.C. 457, 468-69, 546 S.E.2d 575, 586 (2001), *cert. denied*, 534 U.S. 1147, 151 L. Ed. 2d 1002 (2002). "The trial court must [then] determine whether the defendant has carried his burden of proving purposeful discrimination." *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405 (citing *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89); *King*, 353 N.C. at 469-70, 546 S.E.2d at 586-87.

Trial judges, who are "experienced in supervising voir dire," and who observe the prosecutor's questions, statements, and demeanor firsthand, are well qualified to "decide if the circumstances concerning the prosecutor's use of peremptory challenges create[] a prima facie case of discrimination against black jurors." *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88. The trial court's findings will be upheld on appeal unless the " 'reviewing court on the entire evidence [would be] left with the definite and firm conviction that a mistake ha[d] been committed.' " *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766 (1948)). Thus, the standard of review is whether the trial court's findings are clearly erroneous. *State v. Barnes*, 345 N.C. 184, 210, 481 S.E.2d 44, 58 (1997), *cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998); *King*, 353 N.C. at 470, 546 S.E.2d at 587.

The record in the case *sub judice* indicates that Ms. Barbour is an African-American female who was the seventh prospective juror peremptorily challenged by the State. At the time of Ms.

Barbour's challenge, the prosecutor had exercised five peremptory challenges against prospective Caucasian jurors and two peremptory challenges against prospective African-American jurors. Apart from Ms. Barbour, only one other prospective African-American juror had not been excused for cause, but that juror was excused peremptorily by the State after he expressed personal beliefs in opposition to capital punishment.

During *voir dire*, the prosecutor asked Ms. Barbour questions that were similar to those asked of other prospective jurors. When questioned about her feelings regarding the death penalty, Ms. Barbour answered that she doesn't "believe in the death penalty" and has felt that way all her life. Ms. Barbour described her feelings as "[p]retty strong," but she stated that she could vote to recommend a death sentence if the law required. Shortly thereafter, the prosecutor exercised peremptory challenges as to Ms. Barbour and a Caucasian individual who had also indicated apprehension over recommending a death sentence.

Following the prosecutor's exercise of a peremptory challenge against Ms. Barbour, defendant made a motion pursuant to *Batson*. In support of a *prima facie* showing defendant noted the following: (1) Ms. Barbour identified herself as African-American on her jury questionnaire, (2) defendant is African-American, (3) defendant is entitled to rely on a presumption that peremptory challenges "permit those to discriminate who are of a mind to discriminate," and (4) Ms. Barbour's responses were the same or similar to those of prospective Caucasian jurors whom the prosecution did not challenge.

The trial court found that defendant and Ms. Barbour are African-American, as were the decedent Seleana Nesbitt, and the other three victims present in Brooks' car when the shootings occurred. The court also found the State had exercised seven peremptory challenges, five as to prospective Caucasian jurors and one as to a prospective African-American juror. Finally, the trial court stated:

> The [c]ourt does not find that there's anything about the manner in which the jurors have been selected which would tend to indicate discrimination as to race. The [c]ourt finds that there has not been a repeated use of preemptory [sic] challenge[s] against a black prospective juror, that it tends to establish a pattern of strikes against blacks in the venire.

> . . . .

The [c]ourt concludes that the defendant has not shown any relevant circumstances to raise an inference that the prosecuting attorney is using preemptory [sic] challenges to exclude veniremen on this jury on account of their race.

With regard to Ms. Flonard, the record indicates that she is an African-American female who was the next prospective juror peremptorily challenged by the prosecutor following Ms. Barbour. During *voir dire* Ms. Flonard was also asked questions that were similar to the questions asked of other prospective jurors. However, Ms. Flonard was questioned in greater detail about her children, two of whom were incarcerated at the time of defendant's trial. One of them had been previously prosecuted by the same district attorney's office that was currently prosecuting defendant, and the other one had been charged with a crime in the area. The prosecutor asked Ms. Flonard whether she remembered that he had prosecuted one of her sons for robbery. Ms. Flonard was also asked specifically about her other son's criminal history and where he had been incarcerated, and about the locations and occupations of her remaining children. Ms. Flonard stated that she felt her family had been treated fairly by law enforcement and the court system and that she would be able to set aside her past experiences in deciding defendant's case. Thereafter, the State peremptorily challenged Ms. Flonard.

Following the prosecution's peremptory challenge of Ms. Flonard, defendant made a second motion pursuant to *Batson*. In support of a *prima facie* showing, defendant stated that (1) this was the prosecution's third exercise of a peremptory challenge against a prospective African-American juror, (2) the only African-American jurors who were not removed for cause were challenged by the prosecution peremptorily, (3) Ms. Flonard's responses during *voir dire* were similar to those of prospective Caucasian jurors who were not challenged, and (4) no prospective Caucasian jurors were questioned in detail as to their family members' criminal records. The State responded that it had exercised five peremptory challenges against individuals who were not minorities and that "there's not been another juror like Ms. Flonard in that it appears that we have prosecuted both of her sons in this county for very serious charges."

The trial court found that

there has not been a disproportionate use of peremptory challenges to excuse jurors. As to whether the excuse [sic] by peremptory challenge of three black jurors when only three black

jurors have been in the jury panel who were not excused by cause establishes a pattern, the court is of the view that there is no pattern of strikes of minority or black jurors.

If there is a pattern it's certainly not evident by the matter brought forward in the voir dire, nor the manner of selection including the questions and statements used by the prosecuting attorney.

The court concludes at this point that there has not been a prima facie showing by the defendant that the State is exercising a peremptory challenge to exclude jurors on account of race.

We acknowledge, as did the trial court, that no African-American was selected to serve on defendant's jury and that the three African-American jurors who were not excused for cause were challenged peremptorily by the State. However, numerical analysis that may be interpreted to show a pattern of challenges against African-American jurors is just one of many relevant circumstances to be considered in determining the existence of a *prima facie* case of discrimination. *Barden*, 356 N.C. at 344, 572 S.E.2d at 127 (emphasizing that numerical analysis is "not necessarily dispositive" when determining whether a defendant has established a *prima facie* showing of discrimnation). Numbers do not tell the whole story. After a thorough review of the jury selection process and careful examination of all relevant facts and circumstances, we cannot say that the trial court's findings were "clearly erroneous."

Although defendant and the challenged prospective jurors were African-American, the victims and several of the State's key witnesses were African-American as well. For this reason, the shared race of the involved parties tends to contradict an inference of purposeful discrimination by prosecutors. *See State v. Blakeney*, 352 N.C. 287, 309, 531 S.E.2d 799, 815 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001) (noting "both defendant and the victim in this case were African-Americans, 'thus diminishing the likelihood that "racial issues [were] inextricably bound up with the conduct of the trial" ' ") (quoting *State v. Robbins*, 319 N.C. 465, 491, 356 S.E.2d 279, 295, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987)), *quoted in State v. Davis*, 325 N.C. 607, 620, 386 S.E.2d 418, 424 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990) (alteration in original).

Moreover, this Court has held that responses of prospective jurors during *voir dire* are relevant circumstances which may be con-

sidered to determine whether a defendant has established a *prima facie* showing under *Batson. State v. Nicholson*, 355 N.C. 1, 23, 558 S.E.2d 109, 126, *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71 (2002). Here, Ms. Barbour expressed serious reservations about recommending the death penalty and two of Ms. Flonard's children were apparently prosecuted for serious offenses by the Johnston County District Attorney's Office. While these circumstances proved insufficient to support challenges for cause, they provided obvious non-racial reasons for peremptory challenge. Finally, these responses were elicited from Ms. Barbour in a manner that was similar to the questioning of all other prospective jurors and from Ms. Flonard in a manner tailored to address her unique circumstances. In summary, we find no indication in the record before us of questions, comments, or other conduct by prosecutors during *voir dire* that would lead to an inference of discrimination.

For these reasons, we affirm the trial court's ruling as to both prospective jurors and conclude from a review of all facts and relevant circumstances that defendant's argument to the trial court did not give rise to an inference of purposeful discrimination by prosecutors. Thus, defendant did not establish a *prima facie* case as defined and required by *Batson*. This assignment of error is overruled.

[2] In his second assignment of error, defendant argues that the prosecutor asked prospective jurors four types of improper questions during *voir dire*: (1) how jurors would vote during the sentencing phase, (2) whether jurors' decisions would be based upon the law or their personal feelings, (3) whether jurors had sympathy for defendant, and (4) whether jurors understood they were not being asked to pass judgment on defendant. Defendant contends that these questions were "improper, inaccurate, and misleading" and that the questions were prejudicial to his defense. Therefore, defendant requests a new trial.

Because *voir dire* is a continuous dialogue the meaning and effect of an individual question upon prospective jurors is best determined in consideration of counsel's entire *voir dire*. *See* N.C.G.S. § 15A-1214(c) (2003) (providing that each party "may personally question prospective jurors individually concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge"). Accordingly, this Court reviews counsel's questions during *voir dire* in context. *State v. Jones*, 347 N.C. 193, 203, 491 S.E.2d

641, 647 (1997). We consider the prosecutor's questions seriatim and conclude that, when reviewed in context, the questions were permissible in this case.

First, defendant argues that the prosecutor improperly asked two prospective jurors, Ms. Herring and Mr. Geiger, "Do you know right now how you would vote for punishment in this. case?," and a third prospective juror, Ms. Matheny, "Do you feel like in any particular case you are more likely to return a verdict of life imprisonment or the death penalty?" Although defendant objected to all three questions at trial, the trial court overruled defendant's objections. Defendant contends that "[t]hese questions could not possibly have elicited pertinent information about juror qualifications" and that the questions "explicitly asked jurors how they would vote for punishment in this case."

The record reveals that Ms. Herring was questioned at length by both parties, after which defendant challenged Ms. Herring for cause on the grounds that her personal beliefs regarding capital punishment would substantially interfere with her ability to apply the law as instructed by the judge. The trial judge acknowledged that throughout *voir dire* Ms. Herring had "slowly evolve[d] in [her] understanding" of capital punishment. The judge stated, "I see a conflict, as well, between the questions—or her responses to the questions asked of her" and then offered each party an opportunity to further question Ms. Herring. The exchange challenged by defendant occurred during the prosecutor's attempt to rehabilitate Ms. Herring.

Mr. Geiger stated similar reservations about recommending a death sentence, explaining, "It's a pretty likelihood [sic] that I would not be able to follow the law." Shortly thereafter, the prosecutor asked Mr. Geiger to think about "that part of the law that talks about being fairly able to consider the death penalty" and inquired, "As you sit here now, do you know how you would vote at the penalty phase . . . regardless of the facts or circumstances in the case?" Mr. Geiger responded, "I can't say I know with a hundred percent certainty, but I think a good probability."

With regard to Ms. Matheny, the prosecutor asked, "Do you feel like in any particular case you are more likely to return a verdict of life imprisonment or the death penalty?" Ms. Matheny responded that she "probably would lean more" towards recommending a sentence of life in prison. Shortly before asking this question, the prosecutor

STATE v. CHAPMAN

[359 N.C. 328 (2005)]

explained to Ms. Matheny, "No one is trying to ask you what you will do because no one knows," adding, "It's not a fair question." In response, Ms. Matheny stated that she was "not sure" whether she could equally consider capital punishment and life imprisonment as possible sentences.

"Both the defendant and the State have the right to question prospective jurors about their views on capital punishment." *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993). Such questions are appropriate when they test a prospective juror's ability to follow the law as instructed by a trial judge notwithstanding that juror's personal opinions concerning the propriety of capital punishment. *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985); *State v. Brown*, 327 N.C. 1, 14, 394 S.E.2d 434, 442 (1990). While a party may not ask questions which tend to "stake out" the verdict a prospective juror would render on a particular set of facts, *Jones*, 347 N.C. at 201-04, 491 S.E.2d at 646-48, counsel may seek to identify whether a prospective juror harbors a general preference for a life or death sentence or is resigned to vote automatically for either sentence, N.C.G.S. § 9-15 (2003) (counsel is entitled to "make direct oral inquiry of any prospective juror as to the fitness and competency of any person to serve as a juror"). A juror who is predisposed to recommend a particular sentence without regard for the unique facts of a case or a trial judge's instruction on the law is not fair and impartial. *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52.

Here, the prosecutor's questions, when viewed in context, represent a legitimate attempt to elicit prospective jurors' personal views on capital punishment. These general questions did not tend to commit prospective jurors to a specific future course of action. Instead, the questions helped to clarify whether the prospective jurors' personal beliefs would substantially impair their ability to follow the law. Such inquiry is not only permissible, it is desirable to safeguard the integrity of a fair and impartial jury for the benefit of both the prosecution and the defense. Accordingly, this assignment of error is overruled.

Second, defendant contends that the prosecutor improperly asked prospective jurors, "Can you imagine a set of circumstances in which . . . your personal beliefs conflict with the law? In that situation, what would you do?" The prosecutor asked these questions, to which defendant objected, after several prospective jurors stated personal beliefs against the death penalty. Defendant argues that these are "purely speculative hypothetical questions" through which the

STATE v. CHAPMAN

[359 N.C. 328 (2005)]

prosecutor "was attempting to 'fish' without any basis" and that the questions tended to " 'stake out' " prospective jurors.

Regulation of the form of *voir dire* questions is vested within the sound discretion of the trial court, and "[t]he exercise of such discretion constitutes reversible error only upon a showing by the defendant of harmful prejudice and clear abuse of discretion by the trial court." *Jones*, 347 N.C. at 203, 491 S.E.2d at 647. Hypothetical questions are generally prohibited because they may be " 'confusing to the average juror' " and " 'tend to "stake out" the juror and cause him to pledge himself to a future course of action.' " *Id.* at 202, 491 S.E.2d at 647 (quoting *State v. Vinson*, 287 N.C. 326, 336, 215 S.E.2d 60, 68 (1975), *death sentence vacated*, 428 U.S. 902, 49 L. Ed. 2d 1206 (1976)). This Court has explained that "[c]ounsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts." *Vinson*, 287 N.C. at 336, 215 S.E.2d at 68. "Hypothetical questions that seek to indoctrinate jurors regarding potential issues before the evidence has been introduced and before jurors have been instructed on applicable principles of law are similarly impermissible." *Jones*, 347 N.C. at 203, 491 S.E.2d at 647.

Although the form of the prosecutor's questions was hypothetical, these questions did not tend to commit jurors to a specific future course of action in defendant's case, nor were the questions aimed at indoctrinating jurors with views favorable to the State. The questions, "Can you imagine a set of circumstances in which . . . your personal beliefs conflict with the law?" and "In that situation, what would you do?," do not advance any particular position. Rather, the inquiry is designed to prompt one of two answers: (1) "I would follow the law," or (2) "I would follow my personal beliefs." Because jurors must be able to apply the law as instructed, sometimes *despite* their own personal views, the prosecutor's question addresses a key criterion of juror competency. Finally, the questions are simple and clear, without a propensity for confusing jurors. For these reasons, we determine that the trial judge did not abuse his discretion in overruling defendant's objections. This assignment of error is overruled.

Third, defendant contends that the prosecutor improperly asked prospective jurors, "Would you feel sympathy towards the defendant simply because you would see him here in court each day of the trial?" Defendant argues that this question improperly tended to " 'stake out' " jurors to believe that they "could not consider defendant's appearance and humanity in capital sentencing."

In *State v. Brown*, 320 N.C. 179, 199, 358 S.E.2d 1, 15, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987), this Court stated that jurors may consider a defendant's demeanor in recommending a sentence. However, we cannot agree with defendant that this *voir dire* question posed by the prosecutor "improperly tended to 'stake out' jurors to believe that they could not consider defendant's appearance and humanity in capital sentencing." The prosecutor's question does not address definable qualities of defendant's appearance or demeanor. The question concerns jurors' feelings toward defendant, *notwithstanding* his courtroom appearance or behavior. This Court has upheld challenges to similar *voir dire* questions in *State v. Walls*, 342 N.C. 1, 38-39, 463 S.E.2d 738, 757 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996) and *State v. Smith*, 328 N.C. 99, 128-29, 400 S.E.2d 712, 728-29 (1991). We see no compelling reason to depart from our previous holdings. Accordingly, this assignment of error is overruled.

Fourth, defendant contends that the trial court should have intervened *ex mero motu* when the prosecutor asked prospective jurors, "Do you understand as a juror you're not being asked to judge or pass judgment upon the defendant?" Our review reveals that the complete question actually posed by the prosecutor was:

> At this time, I would just ask, does everyone on the jury panel understand that, as a juror, you're not being asked to pass judgment upon the defendant. Do you understand that your role is to sit and listen and observe the evidence, compare that evidence with the definitions of the crime that the Judge will give you, and then see if you're satisfied, beyond a reasonable doubt, that a crime was committed, and that the defendant is the person responsible for those crimes? Does everyone understand that that's your role as a juror?

The prosecutor repeatedly asked prospective jurors this question during *voir dire*, but defendant did not object and now asserts plain error. However, this Court has "decline[d] to extend application of the plain error doctrine to situations where a party has failed to object to statements made by the other party during jury *voir dire*." *State v. Cummings*, 352 N.C. 600, 613, 536 S.E.2d 36, 47 (2000), *cert. denied*, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). Accordingly, we determine that defendant failed to preserve this issue for appellate review.

For the reasons stated above, defendant's second argument which assigns error to four types of *voir dire* questions is hereby overruled.

## GUILT-INNOCENCE PHASE

**[3]** In his third argument, defendant assigns error to the trial court's admission into evidence of an autopsy photograph of the victim Seleana Nesbitt, two photographs of the Nissan Sentra in which Ms. Nesbitt was shot, testimony of three law enforcement officers describing the Nissan's interior and Ms. Nesbitt's wounds, bloodstained seat material seized from the Nissan, and Ms. Nesbitt's clothing. Defendant argues that he is entitled to a new trial because the testimony, photographs, and physical evidence were irrelevant and unfairly prejudicial.

At trial, defendant objected to admission of the photographs and Ms. Nesbitt's clothing but did not object to the testimony of the law enforcement officers or the admission of seat material taken from the Nissan. We hold that the trial court properly overruled defendant's objections and properly admitted the otherwise unchallenged testimony and evidence.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2003). Relevant evidence is generally admissible, but "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* § 8C-1, Rules 402, 403 (2003). " ' "Unfair prejudice," as used in Rule 403, means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one." ' " *State v. Cagle*, 346 N.C. 497, 506, 488 S.E.2d 535, 542 (1997), *cert. denied*, 522 U.S. 1032, 139 L. Ed. 2d 614 (1997) (quoting N.C.G.S. § 8C-1, Rule 403 cmt. (Supp. 1985)), *quoted in State v. DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986).

Rulings under North Carolina Rule of Evidence 403 are discretionary, and a trial court's decision on motions made pursuant to Rule 403 are binding on appeal, unless the dissatisfied party shows that the trial court abused its discretion. *State v. Garcia*, 358 N.C. 382, 417, 597 S.E.2d 724, 749 (2004), *cert. denied*, —— U.S. ——, 161 L. Ed. 2d 122, 73 U.S.L.W. 3495 (2005). The test for abuse of discretion is whether the trial court's "ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a

STATE v. CHAPMAN

[359 N.C. 328 (2005)]

reasoned decision.' " *State v. Hyde*, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)) (alteration in original). However, our review of those matters to which defendant did not object at trial is limited to plain error. N.C. R. App. P. 10(b)(1), (c)(4); *Cummings*, 352 N.C. at 613, 536 S.E.2d at 47 (explaining that plain error review will be applied only to matters of evidence and jury instructions); *see also State v. Greene*, 351 N.C. 562, 566, 528 S.E.2d 575, 578 (2000). Plain error is error " 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *State v. Parker*, 350 N.C. 411, 427, 516 S.E.2d 106, 118 (1999), *cert. denied*, 528 U.S. 1084, 145 L. Ed. 2d 681 (2000) (quoting *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)). Accordingly, we review admission of the photographs and Ms. Nesbitt's clothing for abuse of discretion and admission of the seat material and the law enforcement officers' testimony for plain error.

First, defendant challenges an autopsy photograph (State's exhibit no. 2) that was admitted during the testimony of forensic pathologist Robert L. Thompson, M.D. and two photographs of Greg Brooks' Nissan (State's exhibits nos. 11 and 12) that were admitted during the testimony of Bobby W. Massey, a former Special Agent with the North Carolina State Bureau of Investigation. Dr. Thompson testified that State's exhibit no. 2 was a fair and accurate depiction of Seleana Nesbitt's body at the time of the autopsy. Agent Massey testified that State's exhibits nos. 11 and 12 were fair and accurate depictions of the interior of the Nissan Sentra in which Ms. Nesbitt was a passenger when she was shot. Both witnesses also testified that using the photographs would help illustrate their testimony to the jury, but defendant objected to admission of each photograph on the ground that the photographs were irrelevant and unfairly prejudicial. In overruling defendant's objection as to the autopsy photograph, the trial court gave a limiting instruction, stating that the photograph was admissible only "to explain and illustrate the testimony of [Dr. Thompson]." The trial court further instructed jurors, "You may not consider [this] photograph[] for any other purpose." Likewise, the trial court admitted photographs of the Nissan into evidence for "illustrative purposes" only.

Dr. Thompson, who performed the autopsy on Seleana Nesbitt, testified that State's exhibit no. 2 showed the back of Ms. Nesbitt's

head and illustrated the path of the bullet. From this photograph, Dr. Thompson pointed out the location of the entry of the bullet, the track of the bullet, the final location of the bullet, and the overall wound from which he recovered bullet fragments. Thereafter, Dr. Thompson gave his expert opinion that the cause of Ms. Nesbitt's death was this "gunshot wound of the head."

Special Agent Massey's responsibility was to collect bullet fragments and blood samples from the Nissan in which Ms. Nesbitt was riding at the time she was shot. Agent Massey testified that he took the two photographs of the vehicle's interior that are challenged by defendant. Both photographs depict the rear passenger seat behind the driver's seat and were taken from the front passenger side door. During publication of the photographs to the jury, Agent Massey testified that State's exhibit no. 11 showed the driver's side rear seat cushion and floor, including several music tapes and other items which had accumulated there. State's exhibit no. 12 also showed the rear passenger seat cushion, but with the tapes and other items removed. Large blood stains were visible in both photographs. Earlier in his testimony, Agent Massey described the Nissan's interior as "relatively clean" except for "what appeared to be apparent blood and brain tissue . . . heavy in and around the driver side rear seat and floor area."

" 'Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed *solely* at arousing the passions of the jury.' " *Blakeney*, 352 N.C. at 309-10, 531 S.E.2d at 816 (quoting *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526) (emphasis added). In particular, photographs may be used "to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526; *see also Blakeney*, 352 N.C. at 310, 531 S.E.2d at 816. In the past, this Court has affirmed a trial court's admission of autopsy photographs which corroborated the cause of death, *see State v. Goode*, 350 N.C. 247, 259, 512 S.E.2d 414, 421-22 (1999), and admission of crime scene photographs which show the location and circumstances of death, *see State v. Haselden*, 357 N.C. 1, 14-15, 577 S.E.2d 594, 603, *cert. denied*, 540 U.S. 988, 157 L. Ed. 2d 382 (2003).

After thorough review of the exhibits and transcript, we conclude that the trial court did not abuse its discretion by admitting the autopsy photograph of Ms. Nesbitt and two photographs of the

Nissan's interior. The trial court admitted each photograph for illustrative purposes only, and both Dr. Thompson and Agent Massey used the photographs to explain relevant portions of their testimony. In particular, the autopsy photograph tended to explain and support Dr. Thompson's expert opinion as to the cause of Seleana Nesbitt's death. The photographs of the Nissan's interior corroborated Agent Massey's testimony describing the crime scene and showed the location at which Ms. Nesbitt sustained the gunshot wound. Thus, the record demonstrates that the challenged photographs were not introduced *solely* to inflame the passions of the jury.

We determine that each photograph carried significant probative value to illustrate and corroborate a witness's testimony. Because this probative value was not substantially outweighed by danger of unfair prejudice, we affirm the trial court's rulings admitting these photographs into evidence. This assignment of error is overruled.

Second, defendant assigns plain error to Agent Massey's statements that "blood and brain tissue was heavy in and around the driver side rear seat and floor area" of the Nissan and that the Nissan's rear seat was blood-stained "to the point it has soaked through the cloth itself to where if you pushed it, it would just come back out, like a sponge." Agent Massey further stated, "And, of course, all these items, tapes, et cetera, are covered with the same red stains." Agent Massey made these statements in connection with State's exhibits nos. 11 and 12, while describing those images to the jury. Like the corresponding photographs, we find that these statements carry significant probative value tending to show the location and circumstances of Seleana Nesbitt's death. Similarly, this probative value is not outweighed by danger of unfair prejudice. For these reasons, the admission of Agent Massey's testimony was not error, much less plain error. We affirm the trial court's admission of Agent Massey's testimony.

Third, defendant challenges the testimony of former evidence and crime scene technician Monroe Enzor and the trial court's admission of blood-stained seat cushion fabric from the Nissan. Mr. Enzor testified that on 9 July 2000, he was employed by the Johnston County Sheriff's Office, where his responsibilities were to "observe, collect and preserve, [and] store" evidence. Mr. Enzor further testified that he collected "blood stain material . . . from the driver side rear vertical seat corner" while processing the Nissan with Agent Massey. Mr. Enzor identified State's exhibit no. 33 as seat cushion fabric which he received from Agent Massey, bagged, and labeled. Agent

Massey later testified that he removed the fabric from the seat cushion as a "blood sample[]." When the State moved to introduce exhibit no. 33 into evidence, defendant did not object; therefore, defendant may prevail only upon a showing of plain error. N.C. R. App. P. 10(b)(1), (c)(4).

Our review of the record indicates that the fabric swatch was introduced by prosecutors solely to inform the jury that stains on the Nissan's rear seat had been tested for blood and that the stains were in fact blood. We find this evidence to be probative of the location and circumstances of Seleana Nesbitt's death and further find that this probative value is not outweighed by danger of unfair prejudice. Accordingly, admission of Mr. Enzor's statement that he collected "blood stain material" and admission of the material itself was not error, plain or otherwise.

Fourth, defendant challenges Mr. Enzor's testimony that he "went by the morgue to collect some items of clothing from the gurney that Ms. Nesbitt was laying on." Mr. Enzor stated that he placed Ms. Nesbitt's clothing in a sealed box which was then stored in an evidence room. Defendant objected to Mr. Enzor's opening of the box in front of the jury and to admission of Ms. Nesbitt's clothing into evidence. The trial court heard counsel's arguments outside the presence of the jury and permitted the State to conduct *voir dire* during which Mr. Enzor opened the box, identified the articles of clothing contained therein, and affixed a label to each item. Following *voir dire* the prosecutor moved to introduce Ms. Nesbitt's clothes into evidence without publishing them to the jury. The trial court ruled that the State had laid sufficient foundation for admissibility, that the clothing was relevant under this Court's decision in *State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), and that the clothing's probative value was not outweighed by the danger of unfair prejudice. Thereafter, the jury returned to the courtroom, and at the State's request, Mr. Enzor briefly listed the labeled items without removing them from the box.

In *State v. Gaines*, this Court held that the trial court did not abuse its discretion by admitting a victim's bloody police uniform, gun, and radio into evidence. 345 N.C. at 665-66, 483 S.E.2d at 407. In doing so, the Court stated, " 'Bloody clothing of a victim that is corroborative of the State's case, is illustrative of the testimony of a witness, or throws any light on the circumstances of the crime is relevant and admissible evidence at trial.' " *Id.*, 345 N.C. at 666,

483 S.E.2d at 407 (quoting *State v. Knight*, 340 N.C. 531, 559, 459 S.E.2d 481, 498 (1995)). Moreover, it is well established that " '[a]rticles of clothing identified as worn by the victim at the time the crime was committed are competent evidence.' " *State v. Lloyd*, 354 N.C. 76, 100, 552 S.E.2d 596, 615 (2001) (quoting *State v. Rogers*, 275 N.C. 411, 430, 168 S.E.2d 345, 356 (1969), *cert. denied*, 396 U.S. 1024, 24 L. Ed. 2d 518 (1970)) (alteration in original).

We hold that the clothing worn by Seleana Nesbitt at the time of her death is relevant and admissible under our prior case law. Here, the clothing was not published to the jury and was minimally discussed during the direct examination of Mr. Enzor, whose testimony served to authenticate the items. Under these circumstances danger of unfair prejudice does not substantially outweigh the probative value of the clothing. Accordingly, the trial court did not abuse its discretion in admitting Ms. Nesbitt's clothing and we affirm the trial court's ruling.

Defendant also assigns plain error to Mr. Enzor's testimony that he picked up Ms. Nesbitt's clothing "from the gurney that Ms. Nesbitt was laying on." This testimony tends to identify the clothing in question as belonging to Ms. Nesbitt and as being worn by Ms. Nesbitt at the time of her death. Accordingly, Mr. Enzor's testimony was relevant and admissible for authentication purposes. We do not find the statement to be unfairly prejudicial under North Carolina Rule of Evidence 403. Therefore, the trial court did not err by admitting Mr. Enzor's statement.

Fifth, defendant challenges the testimony of Detective Wayne Sinclair of the Johnston County Sheriff's Department that he observed Seleana Nesbitt's body in the hospital emergency room at 5:00 a.m. on 9 July 2000, where Nesbitt "had a cervical collar around her neck . . . [and an] incubating [sic] tube down—entering her mouth." Detective Sinclair described Nesbitt's injury as "a gaping head wound with brain matter showing." However, defendant did not object to Detective Sinclair's description at trial.

Again, this evidence is probative of the cause and nature of Ms. Nesbitt's death. Because we do not find that the testimony's probative value is substantially outweighed by danger of unfair prejudice, we find no error, much less plain error, in its admission.

For the reasons stated above, we affirm the trial court's rulings admitting an autopsy photograph of Seleana Nesbitt, two pho-

tographs of the Nissan's interior, and the clothing worn by Ms. Nesbitt on the night of her death. We further conclude that the trial court did not err by admitting the challenged testimony of Agent Massey, Mr. Enzor, and Detective Sinclair or by admitting a blood-stained fabric swatch removed from the Nissan. Accordingly these assignments of error are overruled.

**[4]** In his fourth argument, defendant assigns error to the trial court's admission of hearsay evidence during the direct examination of State's witness Detective Wayne Sinclair. Detective Sinclair testified that he interviewed defendant on 12 July 2000. Detective Sinclair then read a statement made by defendant during that interview to the jury. Defendant contends that Detective Sinclair's testimony contained hearsay within hearsay, which violated North Carolina Rules of Evidence 802 and 805. Defendant further contends that the testimony was irrelevant and unfairly prejudicial in violation of North Carolina Rules of Evidence 401, 402, and 403. Also, defendant argues for the first time on direct appeal that admission of the testimony violated the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States. We conclude that the challenged portion of Detective Sinclair's testimony is relevant and that it does not contain impermissible hearsay and is not unfairly prejudicial. We further conclude that defendant did not preserve an assignment of constitutional error for review. *Lloyd*, 354 N.C. at 86-87, 552 S.E.2d at 607 ("Constitutional issues not raised and passed upon at trial will not be considered for the first time on appeal."); *Cummings*, 352 N.C. at 613, 536 S.E.2d at 47 (explaining that plain error review is limited to matters of evidence and jury instruction). Accordingly, we affirm the trial court's ruling allowing Detective Sinclair to read defendant's statement in full.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801 (c) (2003). " 'If a statement is offered for any purpose other than that of proving the truth of the matter stated, it is not objectionable as hearsay.' " *State v. Irick*, 291 N.C. 480, 498, 231 S.E.2d 833, 844-45 (1977) (quoting 1 *Stansbury's N.C. Evidence* § 141 (Brandis Rev. 1973) at 467-71). Additionally, a defendant's own statement is admissible when offered against him at trial as an exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 801(d) (2003).

On direct examination, Detective Sinclair testified from his notes of defendant's interview. During the interview, defendant told

Detective Sinclair that he and Lee Green stayed at an apartment in Selma with two females named Candy and Keama on the night of the shooting. The following morning, defendant and Mr. Green went to the home of Garry Yarborough, where defendant slept. When Detective Sinclair read a part of defendant's statement that an unknown individual called Mr. Yarborough's house around noon on the day following the shooting, defendant objected and asked to be heard outside the presence of the jury. The trial court directed that Detective Sinclair read the remainder of defendant's statement into the record: "Around noon, somebody called and said they were going to kill whoever was in the house over Seleana Nesbitt's death. Mr. Chapman then left and went to [Lee] Green's house."

Defendant's attorney conceded that "[t]he statement of the defendant, obviously, is not hearsay," but argued that "what somebody else said, I believe, is hearsay and does not come under any exceptions." The trial court overruled defendant's objection, finding defendant's own statement to be admissible as the statement of a party-opponent and further finding that the unidentified caller's statement fell within an exception to the hearsay rules. The trial court then requested for the jury to return, and Detective Sinclair completed his testimony regarding the phone call.

"Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule." *Id.* § 8C-1, Rule 805 (2003). Here, the statement of defendant to Detective Sinclair is clearly admissible as the statement of a party opponent. *Id.* § 8C-1, Rule 801(d). Further, words of the unidentified caller contained within defendant's statement to Detective Sinclair are not hearsay because they were not offered to prove the truth of the matter asserted. *Irick*, 291 N.C. at 498, 231 S.E.2d at 844. Evidence of the phone call was admitted to show defendant's response to receiving the call, not to prove that the caller would actually harm the people in Mr. Yarborough's house. Thus, the phone call was admissible to explain defendant's subsequent conduct in leaving Mr. Yarborough's house. Because neither portion of defendant's statement contains inadmissible hearsay, we affirm the trial court's ruling admitting Detective Sinclair's testimony.

Defendant also contends that the challenged portions of Detective Sinclair's testimony were irrelevant and unfairly prejudicial under North Carolina Rules of Evidence 401 and 403. However, defendant did not base his objection before the trial court on grounds

of irrelevancy or unfair prejudice. Moreover, defendant devotes no more than one sentence to this argument in his brief, stating in conclusory fashion that "the evidence was irrelevant under Evidence Rules 401-403 because what the caller said on July 9 did not have any tendency to make the existence of any consequential fact in this case more or less probable and was unfairly prejudicial." *Cf.* N.C. R. App. P., Rule 28(a) (2005) ("Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned"). Under these circumstances, we conclude that Detective Sinclair's testimony was relevant to explain defendant's course of conduct following the shooting and that the statement was not unfairly prejudicial.

For the reasons stated above, defendant's fourth argument and all assignments of error contained therein are overruled.

[5] In his fifth argument, defendant assigns error to Detective Sinclair's testimony that he overheard Lee Green tell his mother, "I'm tired of lying and I'm going to tell them the truth" during a phone call that Green made from the police interview room. Defendant contends that the testimony in question was noncorroborative and prejudicial. We determine that Detective Sinclair's testimony was admissible to corroborate the earlier testimony of State's witness, Lee Green, and affirm the trial court's ruling admitting Detective Sinclair's statement.

Detective Sinclair interviewed each passenger of the Cadillac Seville on 12 July 2000, including defendant and Lee Green. Defendant told Detective Sinclair that he and Green had stayed with two females named Candy and Keama on the night of the shooting. Based upon this and other information, Detective Sinclair asked Detective Tommy Beasley, who was also assigned to the investigation, to drive to Selma and confirm defendant's statements. Detective Beasley traveled to Selma while Detective Sinclair completed Green's interview. During the interview Green gave a statement denying any knowledge of the shooting.

Detective Beasley returned from Selma with Candy and Keama at the same time Detective Sinclair finished his interview with Green. Green was left alone in the interview room while Detective Sinclair went to confer with Detective Beasley. Green testified that he believed Detective Sinclair had gone to speak with Candy and Keama. In response to the prosecutor's questions, Detective Sinclair testified to the following exchange, which occurred when he re-entered the interview room:

Q. What did you tell Mr. Green?

A. I reapproached Mr. Green. I told Mr. Green that that was very true what he had told me in the interview, that he had stayed the night with two young ladies, because we had checked that out. And, also, there were statements made at that house that night of him being aware of the shooting that occurred on—

[DEFENSE COUNSEL]: Objection.

A. —on 39 highway.

THE COURT: Objection overruled, then.

Q. And what, if any, reaction did you observe in Mr. Green?

A. Mr. Green got upset and started to cry.

Q. Had he exhibited this type of emotional state up until that point?

A. No, sir, he had not.

Q. What happened next?

A. Mr. Green was allowed to use the telephone.

Q. How did that subject come up?

A. Mr. Green asked me if he could use the telephone.

Q. Did he tell you who he wanted to call?

A. Mr. Green told me he wanted to call his mother.

Thereafter, Detective Sinclair testified that he was able to hear Green's portion of the phone conversation. Detective Sinclair also confirmed that his interview with Green continued "as a result of that phone call."

When the prosecutor asked Detective Sinclair, "What did you hear in terms of Mr. Green's end of the conversation?," defendant objected. The trial court initially sustained defendant's objection but agreed to hear arguments from counsel outside the presence of the jury at the State's request. The prosecutor argued that the challenged testimony was being offered "to corroborate prior testimony of Mr. Green" and that the testimony was alternatively admissible as a present sense impression, excited utterance, or then existing mental, emotional, or physical condition. The trial judge requested an offer of proof to determine whether the statements were corroborative,

which the State provided. During the offer of proof, Detective Sinclair testified that he heard Green say, "[M]ama . . . I'm tired of lying. I'm going to tell them the truth."

Defense counsel responded, conceding that the statement "probably does come under the [hearsay] exceptions of the present sense or then existing mental state" and that "[i]t might even be a statement against penal interest." Then defense counsel clarified, "Our objection was based upon his offer of corroboration, not the other." The trial court overruled defendant's objection, ruling "the statement of Detective Sinclair concerning what Lee Green stated to him is admissible for corroboration." Before Detective Sinclair's testimony continued, the trial court issued a limiting instruction to the jury, explaining that the statement in question could be considered "together with all other facts and circumstances bearing upon the witness[], Lee Green['s], truthfulness, in deciding whether you will believe or disbelieve his testimony at trial." Following this limiting instruction, Detective Sinclair testified that during the phone call he heard Mr. Green say, "I'm tired of lying and I'm going to tell them the truth."

Corroboration is the " 'process of persuading the trier of facts that a witness is credible.' " *State v. Burton,* 322 N.C. 447, 449, 368 S.E.2d 630, 632 (1988) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 49 (2d ed. 1982)). Corroborative evidence " 'tends to strengthen, confirm, or make more certain the testimony of another witness.' " *Lloyd,* 354 N.C. at 103, 552 S.E.2d at 617 (quoting *State v. Rogers,* 299 N.C. 597, 601, 264 S.E.2d 89, 92 (1980)). Prior consistent statements of a witness are admissible to corroborate the testimony of a witness whose truthfulness has been impeached. *State v. Gell,* 351 N.C. 192, 204, 524 S.E.2d 332, 340, *cert. denied,* 531 U.S. 867, 148 L. Ed. 2d 110 (2000). It is "well established that the corroborative testimony may contain 'new or additional information when it tends to strengthen and add credibility to the testimony which it corroborates.' " *Burton,* 322 N.C. at 450, 368 S.E.2d at 632 (citation omitted). We determine that Detective Sinclair's testimony that he overheard Green state "I'm tired of lying and I'm going to tell them the truth" is admissible as a prior consistent statement which tends to strengthen Green's credibility.

Earlier during the trial, the State called Lee Green to testify. Green described his interviews at the police station and stated that he had given an initial statement to Detective Beasley, but that statement had been a lie. Green said that in this first statement, "I told

them what I was told to say, everything but the shooting." After waiting for a short time, Detective Sinclair entered the room and asked to question Green a second time. Green testified that during this second interview, "At first I was still lying . . . . I told the first story that I made about everything but the shooting."

Green further explained:

And then I think Keama and Candy walked in. And I think Sinclair, he told me to wait, to hold on a minute.

. . . .

I guess they had to talk to Keama or something, Keama and Candy, and then he came back to me. And that's when I broke down and asked to call my mom, and I told the truth.

Green stated, "I told [my mother] that I knew something about the shooting. And she told me—well, she just told me to tell what I know, so I did."

Detective Sinclair's testimony adds "strength and credibility" to Green's testimony that, although he initially lied to law enforcement, he decided to tell the truth after speaking to his mother. For this reason, we agree with the trial court that Detective Sinclair's testimony was "generally corroborative of Lee Green's testimony" and affirm the trial court's ruling admitting Green's statement. This assignment of error is overruled.

**[6]** In his sixth argument, defendant assigns error to three statements made by Detective Sinclair about his interview with Green on direct examination: (1) that law enforcement had "checked . . . out" Green's story about staying with Candy and Keama and found it to be "very true," (2) that "there were statements made" at Candy and Keama's apartment that Green was "aware of the shooting that occurred on . . . 39 highway," and (3) law enforcement had information that Green "stayed the night with" Candy and Keama. Defendant contends that Detective Sinclair's testimony contained inadmissible hearsay and violated the Sixth Amendment to the United States Constitution.

As explained above, " '[A] statement . . . offered for any purpose other than that of proving the truth of the matter stated . . . is not objectionable as hearsay.' " *Irick*, 291 N.C. at 498, 231 S.E.2d at 844

(citation omitted). Here, the central purpose for offering Detective Sinclair's statements was to show Green's response to being caught in a lie during his second police interview. Whether Detective Sinclair actually confirmed the information he shared with Green was tangential to the State's case. The record reveals that upon hearing Detective Sinclair's statements, Green "broke down" in tears and asked to call his mother, after which Green told law enforcement a different story. Because we conclude that the statements challenged by defendant were not offered "to prove the truth of the matter asserted," we find that Detective Sinclair's testimony was not hearsay and was, therefore, properly admitted.

Finally, defendant states in his brief that admission of the challenged portions of Detective Sinclair's testimony violated the Sixth Amendment of the United States Constitution. However, the record reflects that defendant did not state a constitutional basis for his objections at trial. As discussed above, constitutional arguments will not be considered for the first time on appeal. *Lloyd,* 354 N.C. at 86-87, 552 S.E.2d at 607; *Cummings,* 352 N.C. at 613, 536 S.E.2d at 47 (explaining that plain error review will be applied only to matters of evidence and jury instructions). Accordingly, we determine that defendant's constitutional assignment of error on this matter has been waived. For the reasons stated above, defendant's sixth argument is overruled.

[7] In his seventh argument, defendant assigns error to the State's witness Jared Clemmons' statements that he testified truthfully during direct and redirect examinations. Defendant contends that these statements were irrelevant and unfairly prejudicial and thus inadmissible. Also, in his eighth argument, defendant assigns error to admission of Clemmons' testimony that he was represented and advised by counsel during the formalization of a plea agreement related to Seleana Nesbitt's death. Defendant further assigns error to admission of the testimony of State's witness Thomas Manning, Clemmons' attorney, arguing that evidence Clemmons was represented by counsel during plea negotiations on charges related to Nesbitt's death is "totally irrelevant to any substantive issue in these cases" and constitutes "improper 'vouching' for Clemmons' credibility." Because our resolution of defendant's seventh and eighth arguments is dependent upon the same facts, we address these issues together.

On direct examination, Jared Clemmons testified that he drove the Cadillac Seville from which defendant and DaJuan Morgan fired their weapons on the night of Seleana Nesbitt's death. Clemmons

STATE v. CHAPMAN

[359 N.C. 328 (2005)]

further testified that on 10 April 2001, he pled guilty to the second-degree murder of Ms. Nesbitt in exchange for imposition of a sentence in the range of eight to twenty years. Clemmons stated that he was not sentenced on 10 April 2001, rather the court entered a prayer for judgment to be continued until the State's cases against defendant and Morgan were resolved. The terms of Clemmons' plea agreement required that "[i]f called upon, [Clemmons] shall testify truthfully in State v. LaMorris Chapman . . . . The presiding trial judge in these matters shall be the arbiter as to the truthfulness of [Clemmons'] testimony. In exchange for his truthful testimony, [Clemmons] shall receive an active sentence in the court's discretion." Clemmons confirmed he understood the need to testify truthfully to uphold the terms of his plea agreement and that he had been truthful during his interview with Detective Sinclair and during his testimony before the trial court.

During cross-examination, defense counsel devoted considerable effort to impeaching Clemmons' credibility, implying that Clemmons lied to the court by pleading guilty to second-degree murder, even though Clemmons did not believe he had committed that crime. Counsel's questioning on this point fills at least seven pages of trial transcript, and the most pointed exchange follows:

Q. According to your testimony, you didn't do anything wrong, did you?

A. No, I didn't?

Q. You didn't?

A. No, I didn't.

Q. But you pled guilty to second-degree murder?

A. Yeah. Because I was told if I took it to trial I would have lost.

Q. Well, you were asked specifically by the judge, according to [your plea agreement], are you, in fact, guilty. And you said yes, I am guilty.

A. I had to say that.

Q. Beg your pardon.

A. I had to say that. If I took it to trial, I would have lost.

Q. But that wasn't true, was it? I mean, you're not even guilty, are you?

A. You know what I'm saying, I'm charged with first-degree murder, but I didn't kill anybody.

Q. Well, I understand that. But you don't believe you're guilty of murder, do you?

A. No, I do not.

Q. Well, then, when the judge specifically asked you on this plea transcript are you in fact, guilty, you said yes. You weren't telling the truth, were you?

A. Because I had to pled [sic] guilty to that.

Q. You had to pled [sic] guilty to that. You had to say that on this so that it would benefit you; isn't that right?

A. Yes.

Q. Likewise, you have to testify according to what they want you to testify to, be truth, and say it's truthful, otherwise, it won't benefit you?

     . . . .

A. I'm telling you the truth.

Q. Were you telling the judge the truth on April 10?

A. I had to be forced to say I was guilty.

Q. The question was, sir, were you telling the judge the truth on April 10?

A. Yeah. Telling the truth about what?

Q. That you were, in fact, guilty?

A. I had to say I was guilty. I had to.

Q. So, I mean, you did not tell the judge the truth?

A. I didn't say that. I said I had to go plead guilty to second-degree murder or else I went to trial and lost at trial.

Q. And you would be facing the death penalty?

A. Could of been, or life without parole.

Q. So you're willing to tell the judge on April 10 something that wasn't true so that you would get the deal that you got, right?

A. No.

Q. Well, then, why did you not tell the judge the truth on April 10?

A. What do you mean, I didn't tell him the truth?

Q. Right.

A. I had to plead guilty to that. I had no choice but to plead guilty to that.

Defense counsel posed similar questions on re-cross-examination.

On redirect, the prosecutor sought to rehabilitate Clemmons by asking, "Did your lawyer advise you on this plea?" and later, "So you had an understanding after you had talked to your lawyer why you were pleading guilty?" The prosecutor also asked Clemmons, "Have you told the truth since you've taken the stand?" to which Clemmons responded, "Yes, I have."

Later, the State called Clemmons' attorney, Mr. Thomas Manning, to "explain why [Clemmons] says I didn't do anything wrong, but I had to plead guilty." The record reflects that Clemmons waived attorney-client privilege as to this issue. On direct examination, Mr. Manning testified to his legal background, including the length of his practice, his field of specialization, and his "AV" Martindale-Hubbell rating. Mr. Manning also stated in general terms that he discussed with Clemmons the elements of crimes for which Clemmons had been charged and the theories of law concerning those crimes, as well as possible punishments and plea offers made by the State. Mr. Manning testified that he advised Clemmons on a course of action based upon his professional knowledge and experience. We conclude Clemmons' testimony that he had testified truthfully was not plain error and that Clemmons' testimony regarding his legal representation, as well as the testimony of Mr. Manning, was permissible in defendant's case.

"The question of whether a witness is telling the truth is a question of credibility and is a matter for the jury alone." *State v. Solomon*, 340 N.C. 212, 221, 456 S.E.2d 778, 784, *cert. denied*, 516 U.S. 996, 133 L. Ed. 2d 438 (1995). In *State v. Skipper*, 337 N.C. 1, 39, 446 S.E.2d 252, 273 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995), this Court affirmed the trial court's ruling sustaining a prosecutor's objection to defense counsel's question on direct examina-

tion, "Are you telling this jury the truth?" The following year, this Court affirmed trial court rulings sustaining objections to two analogous questions also posed by defense counsel: (1) whether the defendant "had accurately pointed out to the prosecutor all the places in his prior statements that were untrue," and (2) whether a witness "knew she was under oath." *Solomon*, 340 N.C. at 220-21, 456 S.E.2d at 784. Therefore, under our prior case law it is improper for defense counsel to ask a witness (who has already sworn an oath to tell the truth) whether he has in fact spoken the truth during his testimony.

However, unlike the above-mentioned cases, the error cited by defendant involves the prosecutor's questions to the State's witness after that witness's credibility had been attacked. Moreover, defendant did not object to the prosecutor's questions concerning Clemmons' truthfulness at trial; thus, defendant must show plain error to prevail on appeal. N.C. R. App. P. 10(b)(1), (c)(4). As stated earlier, plain error is error " 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *Parker*, 350 N.C. at 427, 516 S.E.2d at 118 (citation omitted). After thorough review of the record, we cannot say that Clemmons' responses probably altered the outcome of the trial.

First, Clemmons' statements that his testimony was true were plainly self-serving. The interested nature of Clemmons' averment of truth is especially apparent in light of the terms of Clemmons' plea agreement and defense counsel's impeachment of Clemmons on cross-examination. In addition to constituting the separate crime of perjury, false testimony by Clemmons would void the terms of his plea agreement. Second, inasmuch as Clemmons testified only after taking an oath or affirmation to tell the truth in accordance North Carolina Rule of Evidence 603, the challenged testimony was redundant. Under these circumstances, the admission of Clemmons' testimony was not plain error.

We next consider Clemmons' testimony that he was represented and advised by counsel during entry of his guilty plea to second-degree murder and the testimony of Mr. Manning, Clemmons' attorney. Defendant acknowledges that "where evidence of bias is elicited on cross-examination the witness is entitled to explain, if he can, on redirect examination, the circumstances giving rise to bias so that the witness may stand in a fair and just light before the jury." *State v. Patterson*, 284 N.C. 190, 196, 200 S.E.2d 16, 20 (1973). Here, defend-

ant impeached Clemmons on cross-examination, asking questions which tended to show that Clemmons lied during the entry of his plea and that Clemmons had a motive to lie again while testifying at defendant's trial. Clemmons' redirect testimony that Mr. Manning had advised him regarding the guilty plea and that he understood he bore some responsibility for Ms. Nesbitt's death because he was driving the Nissan, counterbalances the impeachment. We determine that Clemmons' redirect testimony was properly allowed to explain impeaching evidence elicited by defense counsel on cross-examination. Accordingly, the trial court did not err by admitting the challenged testimony.

We further conclude that Mr. Manning was properly called to corroborate Clemmons' testimony after Clemmons was impeached on cross and re-cross-examinations. In *State v. Westbrook*, 279 N.C. 18, 181 S.E.2d 572 (1971), *sentence vacated on other grounds by*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972), this Court affirmed the trial court's admission of a police officer's testimony under similar circumstances. In that case, the defendant was tried and convicted of first-degree murder. *Id.* at 23, 181 S.E.2d at 575. Evidence presented at trial showed that the defendant acted in concert with a man named Johnny Frazier. *Id.* at 33, 41, 181 S.E.2d at 581, 586. The State called Frazier to testify during its case-in-chief, and on direct examination, Frazier described his and the defendant's course of conduct before, during, and after the murder. *Id.* at 23, 33-34, 181 S.E.2d at 575, 581. On cross-examination, defense counsel impeached Frazier with a prior inconsistent statement which recounted a different series of events. *Id.* at 34-35, 181 S.E.2d at 581-82. Thereafter, the State called a police officer to whom Frazier made statements consistent with his trial testimony. *Id.* at 35, 181 S.E.2d at 582. This Court affirmed the trial court's admission of the police officer's testimony, finding that the testimony tended to corroborate Frazier's statements during direct examination and that there was no error in permitting the jury to consider whether the testimony corroborated the statements in question. *Id.* In so doing, the Court held that "[w]here the testimony offered to corroborate a witness does so substantially, it is not rendered incompetent by the fact that there is some variation." *Id.*

Here, defendant argues that Mr. Manning's testimony "did *not* meet defendant's impeachment and was *not* probative of Clemmons' truthfulness; accordingly, it was irrelevant and inadmissible." While we agree that rehabilitative evidence must correspond directly to the impeaching inference raised by the opposing party, our decision in

*Westbrook* makes clear that the test for admissibility is not rigid—rehabilitative evidence need not correlate fact-to-fact with impeaching evidence. Because we conclude that Mr. Manning's testimony *substantially* corroborates Clemmons' testimony by explaining why Clemmons pled guilty to second-degree murder, we affirm the trial court's ruling admitting Mr. Manning's statements.

**[8]** In his ninth argument, defendant assigns error to the testimony of State's witness Detective Wayne Sinclair that defendant surrendered to law enforcement officers in Benson on 14 July 2000 "in the presence of his family and his attorney, Gerald Hayes" and that after taking defendant into custody, Detective Sinclair "did not conduct an interview with the defendant." Although defendant did not object to Detective Sinclair's testimony at trial, defendant now contends that these statements violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Again, constitutional error will not be considered for the first time on appeal. *Lloyd*, 354 N.C. at 86-87, 552 S.E.2d at 607; *Cummings*, 352 N.C. at 613, 536 S.E.2d at 47 (explaining that plain error review will be applied only to matters of evidence and jury instructions). Because defendant did not raise these constitutional issues at trial, he has failed to preserve them for appellate review and they are waived. Accordingly, this assignment of error is overruled.

**[9]** In his tenth argument, defendant assigns error to four classes of statements made by prosecutors during guilt-phase opening statement and closing argument. Specifically, defendant contends that prosecutors improperly (1) commented on defendant's right to remain silent, (2) asserted that the State's witnesses were truthful, (3) misstated the law, and (4) argued an irrelevant "hypothetical factual scenario and an equally hypothetical application of law to that scenario." Defendant further contends that prosecutors' statements were prejudicial error and that he is entitled to a new trial.

Defendant did not object at trial to the first three classes of statements that he now challenges on appeal. "When a defendant fails to object to an allegedly improper closing argument, the standard of review is whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu.*" *State v. Roseboro*, 351 N.C. 536, 546, 528 S.E.2d 1, 8, *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498 (2000). " '[T]he trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of pro-

**STATE v. CHAPMAN**

[359 N.C. 328 (2005)]

priety as to impede defendant's right to a fair trial.' " *State v. Smith*, 351 N.C. 251, 269, 524 S.E.2d 28, 41, *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000) (quoting *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999)). The same standard applies when a defendant fails to object to an opening statement. *State v. Gladden*, 315 N.C. 398, 417, 340 S.E.2d 673, 685, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986). We consider the prosecutor's challenged statements seriatim and determine that each was permissible in this case.

First, defendant argues that prosecutors made improper references to defendant's exercise of the right to remain silent during opening and closing statements. With regard to opening statements, defendant assigns error to the prosecutor's forecast that jurors would "hear from the three occupants of the Cadillac—Lee Green, Shamarh McNeil and Jared Clemmons, three occupants of the Cadillac—I point out to you, three friends of the defendant." With regard to closing argument, defendant assigns error to two prosecutors' explanations of the elements of premeditation, deliberation, and specific intent to kill. In particular, defendant challenges one prosecutor's argument that

> premeditation and deliberation are generally established from the circumstances of a killing, such as vicious or brutal killing. And you may infer premeditation and deliberation from the circumstances of the killing. Why? Because premeditation and deliberation are something which the State can seldom ever prove directly. *It would be nice if you could have a piece of evidence with the defendant coming up here and saying yes, I intended to kill him and then he shoots him. We don't have that statement from the defendant where he said that to somebody or that he's admitted to that.* You've heard all the evidence.

Also, defendant challenges a second prosecutor's request that jurors

> [l]isten closely. Intent is a mental attitude seldom provable by direct evidence. Again, as [my co-counsel] said, *it's not every day you have somebody that says to everybody within the sound of my voice, I'm letting it be known I'm going to kill that person.* It just doesn't happen. It must ordinarily be proved by circumstances from which it may be inferred. An intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties and other relevant circumstances.

Defendant contends that through these three statements, "the prosecutor promised the jury it would 'hear' from interested State witnesses Green, Clemmons, and McNeil and then repeatedly urged the jury to credit Green, Clemmons, and McNeil because it had 'heard' and 'seen' them testify 'on that witness stand in this courtroom in this case.' " Moreover, defendant contends that these statements contain direct and indirect comments on defendant's constitutional right to remain silent.

Section 8-54 of the North Carolina General Statutes states that "[i]n the trial of all indictments, complaints, or other proceedings against persons charged with the commission of crimes, offenses or misdemeanors, the person so charged is, at his own request, but not otherwise, a competent witness, and his failure to make such request shall not create any presumption against him." N.C.G.S. § 8-54 (2003). This Court has consistently interpreted section 8-54 to prohibit the State from referring to or commenting upon a defendant's failure to testify at trial. *State v. Taylor*, 289 N.C. 223, 228, 221 S.E.2d 359, 363 (1976); *Gragg v. Wagner*, 77 N.C. 186, 187-88 (1877). However, within the confines of section 8-54, counsel for both sides are entitled to argue "the whole case as well of law as of fact" to the jury. N.C.G.S. § 7A-97 (2003); *State v. Thomas*, 350 N.C. 315, 354, 514 S.E.2d 486, 510, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999).

Here, the prosecutor's closing argument explains that the State may seek to prove premeditation and deliberation by circumstantial evidence because direct proof of those elements of first-degree murder and first-degree attempted murder is often unavailable. This accurate statement of law, *State v. Smith*, 357 N.C. 604, 616, 588 S.E.2d 453, 461 (2003), *cert. denied*, —— U.S. ——, 159 L. Ed. 2d 819 (2004) ("Premeditation and deliberation, both processes of the mind, must generally be proven by circumstantial evidence"), was directly relevant to the State's theory of prosecution in defendant's case. Although a juror might infer that defendant had exercised his right to remain silent from the prosecutor's statements, that inference is tangential to the State's clear purpose in making this argument.

As this Court determined in *State v. Taylor*, when challenged portions of closing argument "taken in context" do not "encourage the jury to infer guilt from the defendant's silence, . . . they [do] not amount to gross impropriety requiring the trial court to intervene *ex mero motu*." 337 N.C. 597, 614, 447 S.E.2d 360, 371 (1994) (citation omitted). Further, in *State v. Prevatte*, we concluded that "if a prose-

cutor's comment on a defendant's failure to testify was not extended or was a 'slightly veiled, indirect comment on [a] defendant's failure to testify,' there was no prejudicial violation of the defendant's rights." 356 N.C. 178, 248, 570 S.E.2d 440, 479 (2002), *cert. denied*, 538 U.S. 986, 155 L. Ed. 2d 681 (2003) (quoting *State v. Mitchell*, 353 N.C. 309, 326, 543 S.E.2d 830, 841, *cert. denied*, 534 U.S. 1000, 151 L. Ed. 2d 389 (2001)) (alterations in original). Because the prosecutor's argument in the case *sub judice* simply explained the circumstantial nature of evidence tending to show premeditation and deliberation without encouraging jurors to infer guilt from defendant's silence and because any reference to defendant's failure to testify was indirect, we conclude that the trial court did not err by failing to intervene *ex mero motu* during the prosecutor's closing arguments. Accordingly, this assignment of error is overruled.

Further, with regard to the prosecutor's opening statement, we find no reference, "veiled" or otherwise, to defendant's decision to exercise his right to silence. For the reasons stated above, we determine that the challenged statements do not constitute reversible error.

Second, defendant asserts that the prosecutor improperly told jurors that State's witnesses Green, McNeil, and Clemmons would "tell the truth" at trial and that these witnesses in fact "told the truth." During opening statement, the prosecutor introduced Green, McNeil, and Clemmons saying:

The detectives talked to several occupants of the Cadillac— Lee Green, Jared Clemmons and Shamarh McNeil. Initially, these three all stick to their story. They admit to being together and going to Club 39 and going to Selma, but they deny any knowledge of a shooting on Highway 39.

. . .

Three days after the shooting, the hard, tireless work of the Johnston County Sheriff's Department pays off. Lee Green is the first occupant of the Cadillac to add to his story, to tell the whole story *and to tell the truth.* He does that on July 12. Shamarh McNeil is the next occupant of the Cadillac to add to his story, to tell the whole story *and to tell the truth* about what happened . . . .

. . . .

. . . Jared Clemmons, you will hear, has added to his story and told the whole story *and told the truth. Just as did Lee Green and just as did Shamarh McNeil.*

(Emphasis added.)

During closing argument the prosecutor stated:

After the fine investigation of the Johnston County Sheriff's Department got well underway, you see a different side of these young people. You see the youth of Lee, Shamarh and Jared. You see a group of scared kids. Scared because of what happened and scared because of what might happen to them, but they also know what is right and they know what is wrong. And despite the strongest amount of peer pressure, these three young people *came to tell not just part [] of the story, but they came to tell the whole story and they came to tell the truth. They told the truth* when confronted with the reality of life and when confronted with the reality of death.

(Emphasis added.) Defendant contends that these portions of the prosecutor's opening and closing statements improperly expressed the prosecutor's personal opinion that the State's witnesses had given truthful statements to law enforcement and testified truthfully at trial.

"During a closing argument to the jury an attorney may not . . . express his personal belief as to the truth or falsity of the evidence." N.C.G.S. § 15A-1230 (2003). "An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue." *Id.*

Here, defendant placed the credibility of State's witnesses Green, McNeil, and Clemmons in issue during cross-examination. Defense counsel's trial strategy was to show that Green, McNeil, and Clemmons were interested witnesses who were present during the shooting and who might benefit from a jury verdict convicting defendant as a shooter. Defense counsel also sought to portray the witnesses as perpetually untruthful, giving multiple false statements to law enforcement. For example, defense counsel asked Green:

Q. How many statements have you given to Detective Sinclair here that weren't true?

A. I'm not for sure.

STATE v. CHAPMAN

[359 N.C. 328 (2005)]

Q. There was more than one, wasn't it?

A. Yes, sir.

Q. More than two, wasn't it?

A. Yes, sir.

Q. More than three, actually, wasn't it?

A. Yes, sir. But the third one was the truth. I didn't tell everything. I started remembering things.

Q. The third statement you gave you say was the truth?

A. If I can recall, it was the truth, but I didn't tell him everything.

Q. Well, now, in the third statement didn't you say that Jared Clemmons stopped in front of the club and let me out while they left to go do something.

A. Yes, I did.

Q. That wasn't true, was it?

A. No, it wasn't.

Defense counsel impeached each witness with a prior inconsistent statement and also elicited information from each witness which supported an inference of bias. Under these circumstances, prosecutors were entitled to argue why and how the witnesses came to tell law enforcement a second, or in Green's case a third, version of events. The prosecutor was also entitled to argue that, among the numerous statements, the sequence of events advanced by the State should be credited by the jury.

This Court affirmed similar prosecutorial argument in *State v. Wiley*, 355 N.C. 592, 565 S.E.2d 22 (2002), *cert. denied*, 537 U.S. 1117, 154 L. Ed. 2d 795 (2003). In *Wiley*, prosecutors responded to the defendant's "attacks" on a witness by arguing that the witness "came forward and began to tell the truth and has told pretty much the truth." *Wiley*, 355 N.C. at 621, 565 S.E.2d at 43. Likewise, we determine that the prosecutor's statements were permissible in the case *sub judice*.

Third, defendant contends that the prosecutor improperly misstated the law of felony murder when he told jurors:

STATE v. CHAPMAN

[359 N.C. 328 (2005)]

> If you find that the defendant shot into that Nissan Sentra and that it was occupied and that Seleana Nesbitt was killed, then that is felony murder. You don't have to find premeditation, deliberation. You don't have to find malice. Like robbery, discharging a weapon into an occupied vehicle as well as attempted murder are underlying felonies upon which consideration of first-degree [murder] may be predicated.

Defendant argues that the prosecutor's description "completely omitted to state many essential elements of felony murder." Although we agree with defendant that the prosecutor's argument applying the law of felony murder to the facts of defendant's case was oversimplified, we conclude that the prosecutor's statements were not inaccurate or confusing to a degree requiring *ex mero motu* intervention by the trial court.

Finally, defendant contends that the prosecutor argued an irrelevant hypothetical example to the jury, stating:

> This theory of law under the felony murder rule might be a little easier to understand if you could consider the example of a murder committed during the course of another, one of the enumerated felonies under the felony murder rule. Let's take the felony of armed robbery, for example.

> I walk into the local Dash Inn. I've taken a gun with me. I enter and pull the gun out of my coat, point it at the clerk. I demand that the clerk give me all the money in the cash register, the clerk does so, and then suddenly I pull the trigger and kill the clerk. I am guilty of first-degree murder. . . . under the felony murder rule, and under the felony murder rule even the driver of my get-a-way [sic] car outside at the Dash Inn is guilty of first-degree murder so long as the driver of that car shared in the specific intent of robbing the store.

Defendant contends that the prosecutor "traveled far outside the record" and argued facts not in evidence by presenting this hypothetical example to the jury. We note at the outset that hypothetical examples, by their very nature, are fictional and do not purport to contain facts of record or otherwise. Thus, it is unlikely that jurors were misled to believe that the robbery events recited by the prosecutor were perpetrated by defendant.

Moreover, "[i]n jury trials the whole case as well of *law* as of fact may be argued to the jury." N.C.G.S. § 7A-97 (emphasis added).

As this Court has noted in the past, "[t]he origins of this provision are obscure but in *State v. Miller*, 75 N.C. 73, 74 (1876), Justice Reade said:

> Some twenty[]five years ago a circuit judge restrained a lawyer from arguing the *law* to the *jury*, suggesting that the argument of the law ought to be addressed to the court, as the jury had to take the law from the court. Umbrage was taken at that, and the Legislature passed an act allowing counsel to argue both the law and the facts to the jury."

*State v. McMorris*, 290 N.C. 286, 287, 225 S.E.2d 553, 554 (1976) (alteration in original).

Here, by analogy, the prosecutor's example accurately illustrated the law of felony murder. We have allowed a similar presentation of legal argument as reflected in previous cases permitting counsel to support his view of the applicable law with reported decisions of this Court. *Thomas*, 350 N.C. at 355, 514 S.E.2d at 510; *Wilcox v. Glover Motors, Inc.*, 269 N.C. 473, 479, 153 S.E.2d 76, 81 (1967); *Horah v. Knox*, 87 N.C. 443, 445-46, 87 N.C. 483, 486-87 (1882). Consistent with our previous case law and because the prosecutor's remarks were accurate statements directly explaining the law of felony murder, an offense with which defendant was charged, we determine that the prosecutor's statements were permissible in this case.

Defendant's tenth argument and all assignments of error contained therein are overruled.

**[10]** In his eleventh argument, defendant assigns error to the trial court's denial of his motion to dismiss the attempted first-degree murder and first-degree murder charges at the close of all guilt-phase evidence. In support of his motion, defendant argued to the trial court that the State had presented insufficient evidence of specific intent to kill, premeditation, and deliberation to support his convictions on these charges.

The trial court denied defendant's motion to dismiss and instructed the jury on three theories of first-degree murder: (1) malice, premeditation, and deliberation; (2) felony murder based upon the attempted first-degree murder of Brandi Smith; and (3) felony murder based on discharging a firearm into an occupied vehicle. The trial court also instructed the jury on the attempted first-degree murder of Brandi Smith, on acting in concert, and on transferred intent. We affirm the trial court's denial of defendant's motion to dismiss.

In reviewing the trial court's ruling on a defendant's motion to dismiss a charge of first-degree murder, this Court evaluates the evidence presented at trial in the light most favorable to the State. *State v. Walters*, 275 N.C. 615, 623, 170 S.E.2d 484, 490 (1969). The Court considers whether the State presented "substantial evidence" in support of each element of the charged offense. "Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion." *State v. King*, 343 N.C. 29, 36, 468 S.E.2d 232, 237 (1996). Such evidence may be direct, circumstantial, or both. *Id.* Circumstantial evidence alone " 'may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence.' " *State v. Warren*, 348 N.C. 80, 102, 499 S.E.2d 431, 443, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998) (quoting *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988)).

Here, defendant challenges the sufficiency of evidence presented to support two elements of first-degree murder: premeditation and deliberation. Defendant also challenges the sufficiency of the evidence presented to support a finding that he had the specific intent to kill a passenger in the Nissan Sentra.

Premeditation and deliberation are "processes of the mind" which are generally proved by circumstantial evidence. *Smith*, 357 N.C. at 616, 588 S.E.2d at 461. " 'Premeditation means that [the] defendant formed the specific intent to kill the victim for some length of time, however short, before the actual killing.' " *Cagle*, 346 N.C. at 508, 488 S.E.2d at 543 (quoting *State v. Arrington*, 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994)) (alteration in original). " 'Deliberation' means that the defendant formed the intent to kill in a cool state of blood and not as a result of a violent passion due to sufficient provocation." *State v. Truesdale*, 340 N.C. 229, 234, 456 S.E.2d 299, 302 (1995). "Specific intent to kill is an essential element of first degree murder, but it is also a necessary constituent of the elements of premeditation and deliberation." *State v. Jones*, 303 N.C. 500, 505, 279 S.E.2d 835, 838-39 (1981). "Thus, proof of premeditation and deliberation is also proof of intent to kill." *Id.*, at 505, 279 S.E.2d at 838-39. After thorough review of the transcript and for the reasons stated below, we conclude that the State presented substantial evidence to support a conclusion that defendant acted with premeditation, deliberation, and specific intent to kill.

First, the State presented evidence from which jurors could conclude that defendant was upset by seeing his ex-girlfriend, Alecia

Doughty, with Greg Brooks in Brooks' car; thus, defendant had a motive to harm Brooks. While evidence of motive is not essential to a determination of premeditation and deliberation, evidence of motive for the commission of a crime is relevant to that determination and is admissible. *State v. Alston*, 307 N.C. 321, 328, 298 S.E.2d 631, 637 (1983). Moreover, the prosecution may offer evidence of motive to help prove its case when " 'the existence of a motive is . . . a circumstance tending to make it more probable that the person in question did the act.' " *State v. White*, 340 N.C. 264, 292, 457 S.E.2d 841, 857, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 83 (3d ed. 1988)) (alterations in original), *quoted in State v. Hightower*, 331 N.C. 636, 642, 417 S.E.2d 237, 240-41 (1992).

Second, the State presented evidence that defendant acquired one firearm, the .45 caliber handgun, at a pre-arranged meeting with his brother, Chris Chapman, and that defendant and his friend Dennis concealed the handgun, together with an SKS rifle, near the roadside before entering Club 39. On the way home defendant and his friends stopped to retrieve the hidden SKS rifle and handgun; thus, defendant's actions in acquiring firearms show preparation to commit a violent crime. "A defendant's conduct before . . . the killing is a circumstance to be considered in determining whether he acted with premeditation and deliberation." *State v. Leary*, 344 N.C. 109, 121, 472 S.E.2d 753, 760 (1996). As described above, defendant's conduct on the evening of 8 July 2000 supports an inference of premeditation and deliberation. Just hours before the shooting, defendant hid and later retrieved the murder weapons. The close proximity in time between obtaining these firearms and committing the shooting tends to show that defendant sought out the rifle and handgun with the purpose of shooting the occupants of Brooks' Nissan.

Third, the State presented evidence that defendant saw Doughty at Club 39 and tried to speak with her. Brooks, who was also at the club, had not met defendant before, but spoke with him and shook his hand. Although defendant met Brooks at The club, no one in Brooks' vehicle did anything to provoke the attack from defendant or Morgan. This Court has consistently held that " '[lack] of provocation' " is a "[c]ircumstance[] from which premeditation and deliberation may be inferred." *State v. Robinson*, 355 N.C. 320, 337, 561 S.E.2d 245, 256, *cert. denied*, 537 U.S. 1006, 154 L. Ed. 2d 404 (2002) (quoting *Gladden*, 315 N.C. at 430-31, 340 S.E.2d at 693) (alteration in original), *quoted in State v. Keel*, 337 N.C. 469, 489, 447 S.E.2d 748, 759

(1994), *cert. denied*, 513 U.S. 1198, 131 L. Ed. 2d 147 (1995). Accordingly, defendant's prior peaceful interaction with Brooks on the night of the shooting supports an inference of premeditation and deliberation.

Fourth, the State presented evidence that, upon leaving the club, defendant instructed Clemmons to pass several vehicles but not to pass Brooks' Nissan Sentra. At some point, one of the passengers said, "[T]hat's them right there." As Greg Brooks drove by, defendant replied, "[L]et's get that m——rf——r." When the Cadillac was behind Brooks' car, defendant called his brother and told him not to pass the car in front of them because he was "about to shoot up this car."

" '[D]eclarations of the defendant before and during the . . . occurrence giving rise to the death of the deceased' " are also "[c]ircumstances from which premeditation and deliberation may be inferred." *Robinson*, 355 N.C. at 337, 561 S.E.2d at 256 (quoting *Gladden*, 315 N.C. at 431, 340 S.E.2d at 693) (alterations in original), *quoted in Keel*, 337 N.C. at 489, 447 S.E.2d at 759. In the case *sub judice*, the exclamation "that's them right there" gives rise to a reasonable inference that defendant and his friends had found a specific vehicle, Greg Brooks' blue Nissan Sentra. Defendant's response, "[L]et's get that m——rf——r," supports an inference that defendant intended harm to an occupant of the Nissan. This is further evidence from which jurors could find that defendant acted with premeditation and deliberation.

Fifth, the State presented evidence that defendant fired the SKS rifle at Brooks' Nissan six to eight times. Premeditation and deliberation may be inferred from the multiple shots fired by defendant. *State v. Ruof*, 296 N.C. 623, 637, 252 S.E.2d 720, 729 (1979); *State v. Smith*, 290 N.C. 148, 164, 226 S.E.2d 10, 20, *cert. denied*, 429 U.S. 932, 50 L. Ed. 2d 301 (1976).

Sixth, the State presented evidence that after the shooting, defendant and Dennis hid the rifle and handgun in Yarborough's yard. "A defendant's conduct . . . after the killing is a circumstance to be considered in determining whether he acted with premeditation and deliberation." *Leary*, 344 N.C. at 121, 472 S.E.2d at 760. Here, defendant's attempt to cover up his participation in the shooting by hiding the rifle and handgun is evidence from which premeditation and deliberation may be inferred. *State v. Trull*, 349 N.C. 428, 448, 509 S.E.2d 178, 191-92 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80

(1999) ("[A]ttempts to cover up involvement in the crime are among other circumstances from which premeditation and deliberation can be inferred.").

After a thorough review of the transcript, we determine that the State made a sufficient showing to support inferences of defendant's premeditation, deliberation, and specific intent to kill by presenting evidence of: defendant's motive, preparation, and conduct and statements during the events surrounding the shooting; the multiple gunshots fired by defendant; the total lack of provocation for defendant's actions, and defendant's attempt to conceal his involvement in the shooting. Accordingly, we affirm the trial court's denial of defendant's motion to dismiss the charges of first-degree murder and attempted first-degree murder. This assignment of error is overruled.

**[11]** In his twelfth argument, defendant assigns error to the trial court's refusal to instruct the jury on second-degree murder.

"An instruction on a lesser-included offense must be given only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater." *State v. Millsaps*, 356 N.C. 556, 561, 572 S.E.2d 767, 771 (2002). If the State's evidence

> is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, *and there is no evidence to negate these elements other than defendant's denial that he committed the offense*, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986).

Defendant contends that the State did not present sufficient evidence to prove premeditation, deliberation, and specific intent to kill. However, this Court has determined that the State met its burden as to those elements. Accordingly, the only remaining consideration is whether there is evidence to negate the State's case on these points.

Defendant contends that there is substantial contrary evidence, arguing that his statement about shooting "the car" shows that he was not thinking about the people inside the car and did not intend

to kill a human being. Defendant also argues that he "had not had prior difficulty with" the occupants of the blue Nissan, and that the shooting occurred at night, between two moving vehicles at some distance. Defendant states that he was intoxicated at the time of the shooting, that he is borderline mentally retarded, and that he has had many mental and emotional disturbances.

We find defendant's arguments unconvincing. All the evidence presented at trial tended to show that defendant obtained, hid, and retrieved the murder weapons, stalked Brooks by searching out his vehicle on Highway 39, and stated an intent to "get that m——r-f——r." Then defendant fired six to eight shots from an SKS rifle into the confined space of Brooks' occupied vehicle. Defendant's statement that he was going to shoot "the car" and the fact that these shots were fired at night and between two moving vehicles in no way negate the State's evidence of *mens rea.*

Although defendant elicited evidence during the State's case-in-chief that he was intoxicated on the night of the shooting,

> [a] defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the [S]tate, of his intoxication. *Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.*

*State v. Mash,* 323 N.C. 339, 346, 372 S.E.2d 532, 536 (1988) (emphasis added).

As described above, voluntary intoxication is an affirmative defense and the burdens of production and persuasion as to each element of that defense are on the defendant. *Id.* at 346, 372 S.E.2d at 536. However, defendant elected not to put on evidence during the guilt-innocence phase of trial, and there is no indication from the State's evidence that defendant was intoxicated to a degree sufficient to negate *mens rea.*

This Court affirmed a trial court's refusal to submit instructions on second-degree murder under similar circumstances in *State v. Hunt,* 345 N.C. 720, 483 S.E.2d 417 (1997). In *Hunt,* the defendant

consumed beer and liquor, smoked marijuana, and became "pretty high" before killing the victim. Under those circumstances, this Court held that "[e]ven viewed in the light most favorable to defendant, [the] evidence tended to show only that defendant was intoxicated; and it was insufficient to show that defendant was ' "utterly incapable of forming a deliberate and premeditated purpose to kill." ' " *Id.* at 727-28, 483 S.E.2d at 422 (quoting *State v. Medley*, 295 N.C. 75, 79, 243 S.E.2d 374, 377 (1978)), *quoted in State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987). As in *Hunt*, we conclude that evidence of defendant's voluntary intoxication was insufficient to negate the State's evidence of *mens rea.*

Finally, defendant did not present evidence during the guilt-innocence phase of borderline mental retardation or any mental or emotional disturbance. Common sense compels that evidence which is not presented until the capital sentencing proceeding cannot serve as the basis of a trial court's ruling during the guilt-innocence phase. For the reasons stated above, the trial court properly denied defendant's request for submission of a second-degree murder charge to the jury. This assignment of error is overruled.

**[12]** In his thirteenth argument, defendant assigns error to the trial court's refusal to instruct the jury with a special requested instruction defining specific intent to kill. Defendant moved the trial court to supplement the "specific intent to kill" instruction with the following language: "[I]t is not enough that the defendant merely committed an intentional act that resulted in the victim's death." The trial court denied defendant's request and instructed the jurors with the pattern jury instruction instead.

"[I]f a 'request be made for a [special] instruction, which is correct in itself and supported by evidence, the court must give the instruction at least in substance.' " *State v. Lamb*, 321 N.C. 633, 644, 365 S.E.2d 600, 605-06 (1988) (quoting *State v. Hooker*, 243 N.C. 429, 431, 90 S.E.2d 690, 691 (1956)) (alteration in original). The State concedes that defendant's requested instruction was correct in law, but argues there was no evidence presented from which the jury could have found defendant "merely committed an intentional act that resulted in the victim's death." Because we have concluded that there was no evidence presented at trial to negate the State's evidence of *mens rea*, it follows that this requested instruction was also unsupported by the evidence. Accordingly, the trial court did not err in refusing to grant the special instruction. This assignment of error is overruled.

**[13]** In his fourteenth argument, defendant assigns error to the trial court's jury instruction on first-degree murder. Defendant contends that he is entitled to a new trial because the trial court "fail[ed] to submit a not-guilty verdict in the jury instruction mandate in the first-degree [] felony murder case." We find that the trial court did submit the not-guilty verdict; thus, we affirm the trial court's instructions.

Every criminal jury must be "instructed as to its right to return, and the conditions upon which it should render, a verdict of not guilty." *State v. Howell*, 218 N.C. 280, 282, 10 S.E.2d 815, 817 (1940). Such instruction is generally given during the final mandate after the trial court has instructed the jury as to elements it must find to reach a guilty verdict. *State v. Ward*, 300 N.C. 150, 156-57, 266 S.E.2d 581, 585-86 (1980).

Here, the trial court submitted three separate theories of first-degree murder to the jury: (1) malice, premeditation and deliberation, (2) felony murder based upon attempted first-degree murder, and (3) felony murder based upon discharging a firearm into occupied property. While it is true that the trial court omitted language after its instruction for felony murder based upon attempted first-degree murder, the omitted language did not contain circumstances under which the jury should find defendant not guilty. Instead, the omitted language stated that if the jury does not find certain matters, then jurors should not return a verdict of guilty under that theory. At the conclusion of the trial court's mandate on all three theories of first-degree murder, the trial judge instructed the jurors as follows: "If you do not find the defendant guilty of first-degree murder on the basis of malice, premeditation and deliberation and if you do not find the defendant guilty of first-degree murder under the felony murder rule, it would be your duty to return a verdict of not guilty."

Because defendant confuses the trial court's instructions on the three separate theories of first-degree murder with instructions on first-degree murder itself, and because the trial court gave a proper mandate at the closure of the first-degree murder instruction, we determine that the trial court instructed the jury that it could find defendant not guilty of first-degree murder. Accordingly, this assignment of error is overruled.

**[14]** In his fifteenth argument, defendant assigns error to the trial court's denial of his motion to dismiss the charge of first-degree felony murder based upon the felony of discharging a firearm into an occupied vehicle. Defendant contends that there was

insufficient evidence from which reasonable jurors could infer that he had the specific intent to shoot "into" the vehicle, rather than simply "at" the vehicle. After a thorough examination of the record, and in light of our earlier determination that the State presented sufficient evidence of defendant's intent to kill an occupant of the vehicle, we conclude that this argument is meritless. This assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

[15] On 26 January 2004, the United States Supreme Court issued a writ of certiorari to review the question of whether imposition of the death penalty on a person who commits a murder at age seventeen is "cruel and unusual punishment" and thus barred by the Eighth and Fourteenth Amendments to the United States Constitution. *Roper v. Simmons*, 112 S.W.3d 397 (Mo. 2003), *cert. granted*, 540 U.S. 1160, 157 L. Ed. 2d 1204 (2004). Defendant LeMorris Chapman, who was 17 years and 210 days old at the time he murdered Ms. Nesbitt, raised the same issue in his written brief to this Court and also filed a motion to hold this Court's decision pending the United States Supreme Court's decision in *Roper*. This Court allowed defendant's motion on 1 April 2004.

On 1 March 2005, the United States Supreme Court issued its opinion, *Roper v. Simmons*, —— U.S. ——, —— L. Ed. 2d ——, 2005 U.S. LEXIS 2200 at *1 (Mar. 1, 2005) (No. 03-633). Applying *Trop v. Dulles*, 356 U.S. 86, 2 L. Ed. 2d 630 (1958) (plurality opinion), the Court considered " 'evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper*, 2005 U.S. LEXIS 2200 at *18 (quoting *Trop*, 356 U.S. at 101, 2 L. Ed. 2d at 642). The United States Supreme Court held that the Eighth and Fourteenth Amendments to the United States Constitution prohibit the states from imposing a death sentence on offenders who were younger than eighteen years of age when they committed their crime. *Id.* at *43. Because defendant was not yet eighteen years old at the time he murdered Ms. Nesbitt, we vacate defendant's death sentence pursuant to the United States Supreme Court's recent decision in *Roper v. Simmons*.

## CONCLUSION

For the reasons stated above, we find no error in the guilt-innocence phase of defendant's trial and remand this case to

Johnston County Superior Court for imposition of a sentence consistent with this opinion.

NO ERROR IN GUILT-INNOCENCE PHASE; DEATH SENTENCE VACATED; REMANDED FOR NEW SENTENCING PROCEEDING.

Justice NEWBY did not participate in the consideration or decision of this case.